MORRISON v CITY OF EAST LANSING

Docket No. 234361. Submitted December 4, 2002, at Lansing. Decided February 28, 2003, at 9:05 A.M.

Kenneth Morrison and others brought an action in the Ingham Circuit Court against the city of East Lansing and the East Lansing City Council, alleging violation of the Open Meetings Act (OMA), MCL 15.261 *et seq.*, unlawful delegation of authority, and other claims relating to the development by the city of a community center. The court, William E. Collette, J., generally denied the parties' motions for summary disposition, but granted summary disposition in favor of the defendants to the extent that it ordered that the development and use of the community center is a governmental function and, therefore, the city is immune from its zoning code with regard to the development. The claims regarding the alleged OMA violations and unlawful delegation of authority were submitted to the court for decision on stipulated facts. The court held that the defendants violated the OMA, but declined to invalidate the city council's decision to implement the plan it selected or enjoin implementation of the plan, finding the rights of the public were not impaired because the plaintiffs had been able to voice their concerns in meetings held in compliance with the OMA after the OMA violations occurred. The court granted the plaintiffs' motion for reasonable court costs and attorney fees but denied their request for deposition costs. The plaintiffs appealed, and the defendants cross-appealed.

The Court of Appeals *held*:

1. A reasonable basis exists for allowing a governmental unit to develop the land according to its needs without binding it to its own land-regulation ordinances, such as height, setback, parking, and road-access regulations.

2. A community center developed and provided by the city for the locality is a governmental function.

3. The trial court did not err in finding that the committee created by the city council and whose members were appointed by the city council was a public body subject to the OMA. The city council effectively authorized the committee to perform a governmental function, and the committee engaged in more than just plan development and architect and construction-manager selection. The acts

of the committee in holding public meetings and soliciting public input were more akin to acts of a governmental body.

4. The trial court did not abuse its discretion in refusing to invalidate the plan approved by the city council or to grant injunctive relief on the basis that the plaintiffs had a reasonable opportunity to learn about the plan and voice their concerns and opposition.

5. The request for costs for deposition transcripts was properly denied under MCL 600.2549 on the basis that the depositions were not filed with the clerk of the court.

6. The delegation of authority by the city council to the committee was lawful because the city council retained the ultimate decision-making authority.

Affirmed.

1. MUNICIPAL CORPORATIONS — ZONING — GOVERNMENTAL IMMUNITY.

A municipality has immunity from its own zoning ordinances and need not comply with ordinances relating to height, setback, parking, and road-access requirements with regard to its projects.

2. GOVERNMENTAL IMMUNITY — COMMUNITY CENTERS.

A community center developed and provided by a municipality for the locality is a governmental function.

3. OPEN MEETINGS ACT — VIOLATIONS.

A court had discretion to invalidate a decision made in violation of the Open Meetings Act where it finds that the violation impaired the rights of the public under the act; a plaintiff alleging such impairment must make specific factual allegations demonstrating the impairment of the rights of the public (MCL 15.270[2]).

*Lasky Fifarek & Hogan P.C.* (by *John R. Fifarek*) for the plaintiffs.

*McGinty, Jakubiak & Hitch, P.C.* (by *Thomas M. Yeadon* and *Dennis E. McGinty*), for the defendants.

Before: NEFF, P.J., and HOEKSTRA and O'CONNELL, JJ.

PER CURIAM. Plaintiffs appeal as of right from the trial court's order granting plaintiffs costs and attorney fees, but dismissing all other claims under MCR 2.116(A) (judgment on stipulated facts) and MCR 2.116(C)(10) (no genuine issue of material fact).

Defendants cross-appeal the grant of costs and attorney fees, challenging the trial court's determination that they violated the Open Meetings Act (OMA), MCL 15.261 *et seq.* We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from circumstances surrounding the efforts to convert the former Hannah school building and property in East Lansing to a community center.[1] Defendant city purchased the Hannah school building and property from the East Lansing School District. Defendant city council appointed a committee to make recommendations concerning the development of the community center. The individual plaintiffs, who live near the community center, and plaintiff Citizens to Keep Hannah Green, Inc., a nonprofit corporation that the named plaintiffs and Jim and Marion Anderson created, opposed the approved site plan for the community center because of concerns of traffic on a neighborhood street. Specifically, plaintiffs objected to the inclusion of parking at the northwest corner of the site with direct access to Forest Avenue.

In a November 6, 1998, memorandum, the city's director of planning and community development asked the city manager to discuss with the city council the creation of an advisory committee to assist in the selection of architects, designers, and professional service organizations and to advise the council on programmatic needs and other issues to be decided in the planning process for the community-

---

[1] The parties stipulated the facts with respect to two counts of plaintiffs' complaint.

center project. The city manager complied with this request at the city council's November 10, 1998, work session,[2] which was held in compliance with the OMA. Thereafter, at its December 1, 1998, regular meeting, which was held in compliance with the OMA, the city council, by resolution, appointed the Hannah Building Committee (HBC) and approved the steering committee that the HBC selected.

According to the council's liaison to the HBC, who also chaired the HBC and its steering committee, the HBC's implicit duties were to advise the council after conducting research and interviews and obtaining public input on the project design. Specifically, the HBC was expected to interview and recommend architects and construction managers; work with the community and the architect to develop a site plan, including parking location, and recommend the plan to the council; determine tenancy guidelines and criteria; and oversee design of the building's interior.

Between December 1998 and January 2000, the HBC held at least nineteen meetings. Of these nineteen meetings, minutes were taken only for some, including the December 9, 1998, and January 6 and April 26, 1999, meetings[3] and three of the meetings were "noticed" to the public,[4] including those held on September 29, October 20, and December 9, 1999.

---

[2] In addition to regular meetings, the city council holds "work sessions," which are more informal meetings held in a smaller room and not televised but still noticed and open to the public.

[3] These meetings were not videotaped or audiotaped.

[4] According to the city's parks and recreation director's sworn response to interrogatories, notices of the meetings were posted on the city's bulletin board, invitations were sent to residents in a three-to four-block radius surrounding the Hannah Community Center, press releases were sent, and neighborhood association mailings were sent to all neighborhood association presidents and chairpersons of the city's boards and commissions.

Approximately one hundred people attended each noticed meeting, but no one from the public attended the meetings that were not noticed.

Between January 1999 and April 2000, the steering committee held nineteen meetings, twice at local businesses, but none of which was publicly noticed, recorded, or reported in minutes. During its meetings, the steering committee created the request for proposals, developed evaluation criteria for the architect and construction manager, and critiqued potential site plans. Jim Anderson attended one of those meetings.[5] However, Anderson was asked to leave the December 21, 1999, meeting because the steering committee decided to exclude the public because financial matters might be discussed.

The HBC collected proposals from architects, narrowed the pool of candidates, interviewed several, and recommended one architect to the city council; the council then decided, at a public meeting, to hire that architect. Likewise, the HBC utilized this same process with regard to a construction manager, and the council accepted the HBC's recommendation at a public meeting. A design firm recommended northwest parking to serve the auditorium. The architect prepared a site plan "for purposes of discussion" by August 18, 1999.

At the September 29, 1999, HBC meeting, one or more preliminary site-plan drawings were presented for public comment, but these plans differed in unspecified ways from the August 18, 1999, plan.

---

[5] Jim Anderson made repeated efforts to discover the time and location of meetings—seeking assistance from the city's offices—and eventually received some information from the city council's secretary and the public library's scheduling calendar.

Plaintiffs were aware of the September meeting and most attended and expressed their concerns about the presence of parking at the north end and traffic in the neighborhood. The city council did not receive any official report or summary of the public comments.

Sometime before the next noticed meeting, the HBC and its steering committee debated and narrowed the potential site plans. At the October 20, 1999, meeting, the HBC presented four alternative site plans, including two plans with northwest parking and access to Forest Avenue. Again, many plaintiffs expressed their concerns regarding traffic and parking, and again there was no report submitted to the city council.

Between the October and December 1999 noticed meetings, the HBC and the steering committee each met three times. The HBC narrowed the potential site plans to one plan, which included parking at the northwest corner of the site and access to Forest Avenue. The HBC directed the architect to prepare a preliminary site plan using that design. At the December 9, 1999, publicly noticed meeting, the HBC presented that plan, the public discussed other concepts including an alternative plan with no parking to the north and no access to Forest Avenue that Citizens to Keep Hannah Green offered, and the HBC debated and then decided to recommend the preliminary site plan to the city council. Plaintiffs again expressed their concerns at the meeting, no official report was made to the city council, and the meetings were not videotaped or audiotaped.

On December 14, 1999, at a city council work session that was held in compliance with the OMA, the HBC presented one site plan that it recommended. At

that meeting, many plaintiffs who attended expressed their concerns regarding parking and traffic in the neighborhood, and those plaintiffs asked the council to consider a site-plan concept that they had prepared. The council decided to forward the HBC's recommendation to the zoning board of appeals for consideration of a requested variance and to the city's planning commission for review and recommendation.

On February 9, 2000, and on March 8, 2000, the planning commission held public hearings in compliance with the OMA, and plaintiffs raised the same concerns at both meetings. The commission recommended the site plan, subject to certain conditions, by a vote of four to three. During the later meeting, concerns were raised regarding whether the Forest Avenue access complied with East Lansing Ordinance § 5.147A(4)(d)(iii), which prohibits vehicular access to minor residential streets if adequate alternative access is available, including access for emergency vehicles. The planning and zoning administrator explained that the ordinance was one of several standards that the city must consider; he said the city also had to consider access to the building, convenience, and traffic distribution.

On March 21, 2000, the city council held its own public hearing, in compliance with the OMA. After hearing comments from the public, including plaintiffs, and discussing the recommended plan extensively themselves, the council members voted three to two to adopt the site plan with some modifications. The modifications included providing access to the northern parking area from the main drive, with

automatic gates to limit that access, and making the Forest Avenue drive an exit only.

In April 2000, plaintiffs filed suit against defendants, alleging statutory nuisance, violation of a city zoning ordinance, violation of the OMA, and unlawful delegation of authority, and requesting the trial court to exercise superintending control. Plaintiffs and defendants moved for summary disposition, which the trial court generally denied, but granted in favor of defendants to the extent that it ordered that "the development and use of the Hannah Building Center is a governmental function and, therefore, the City of East Lansing in the development of the Hannah Building Center is immune from its Zoning Code, in particular the Plan of Development Requirements contained in the City of East Lansing Code of Ordinances, Section 5.147A."[6]

The parties agreed to a stipulation of facts and submitted the claims regarding the OMA and delegation of authority to the trial court for a decision pursuant to MCR 2.116(A). On April 16, 2001, the trial court held that defendants violated the OMA, but declined to invalidate the city council's decision or to enjoin implementation of the plan, concluding that "the rights of the public were not impaired because of the subsequent meetings held in compliance with the OMA where the [p]laintiffs voiced their concerns." However, the trial court granted plaintiffs reasonable court costs and attorney fees pursuant to MCL 15.271(4) because defendants violated the OMA.[7]

---

[6] Plaintiffs sought leave to appeal, which this Court denied.

[7] Plaintiffs again sought leave to appeal, which this Court denied.

On May 9, 2001, the trial court entered a final order dismissing plaintiffs' claims regarding delegation of authority, statutory nuisance, violation of the zoning ordinance, and superintending control. The court reiterated that it found a violation of the OMA but would not invalidate the city council's decision or enjoin its implementation. The trial court ordered defendants to pay plaintiffs $27,977 in costs and attorney fees, but denied plaintiffs' request for deposition costs. On June 13, 2001, the trial court stayed execution of the final order pending appeal.

## II. ANALYSIS

### A. IMMUNITY

On appeal, plaintiffs first argue that the city is not immune from its plan-of-development ordinance, and thus the trial court erred in determining otherwise. More specifically, plaintiffs argue that the trial court erred in determining that the city is not bound by East Lansing Ordinance § 5.147A(4)(d)(iii), which prohibits vehicular access to minor residential streets if adequate access is otherwise available, including adequate access for emergency vehicles. We disagree. We review de novo issues of law. *Kreiner v Fischer*, 251 Mich App 513, 515; 651 NW2d 433 (2002).

According to plaintiffs, immunity from zoning ordinances is limited to land-use regulations and it does not apply to plan-of-development ordinances. Plaintiffs assert that immunity applies when a municipality is obligated to provide certain essential governmental services, but encounters physical-boundary constraints in fulfilling its obligations. In other words, appropriately zoned land does not always exist, and

thus municipalities must develop the necessary land use, such as a fire station, within an incompatible land-use district, such as a residential area. Plaintiffs claim that immunity from zoning ordinances is restricted to those provisions controlling land use or to situations where it is impossible for a municipality to comply with its ordinance. In support of their argument, plaintiffs cite *Mainster v West Bloomfield Twp*, 68 Mich App 319; 242 NW2d 570 (1976), which provides in relevant part:

> It would appear that a reasonable basis exists for allowing governmental uses, but not similar private uses, in residentially zoned areas. A governmental use, be it a police station, fire house, school, or municipal office, serves the residents of a distinct, limited area, and, in order to be effective, must be located as close as possible to those persons. Such is not usually the case where a business enterprise is involved. Further, a governmental use, by practical necessity, must be located somewhere within the boundaries of the governmental unit. As such, the governmental unit does not have the freedom to construct its structures wherever expedient, as does a private business. Nor does the governmental unit have any real freedom not to build essential governmental structures. [*Id.* at 327.]

Plaintiffs point to this language in *Mainster*, which references only land use, and deduce that a city's immunity from its own zoning ordinances is limited to land use. However, plaintiffs cite no law addressing the separate issue of land regulation, which was not at issue in *Mainster*,[8] nor are we aware of any reported Michigan case that deals with land regula-

---

[8] In *Mainster*, this Court stated only that immunity existed for "zoning regulations" and did not distinguish use regulations from other types of zoning regulations. *Id.* at 324-326.

tion in the context of a city's immunity or lack of immunity from its own land-regulation ordinances. We discern no basis from *Mainster* upon which to conclude that the intent of that case was to confine the immunity to land use only. Consequently, we believe this to be an issue of first impression.

Considering this issue on the merits, we hold that the same reasons for granting a city immunity for land use apply with equal force to land regulation. In other words, we believe that a reasonable basis exists for allowing a governmental unit to develop the land according to its needs without binding it to its own land-regulation ordinances. Stated another way, a governmental unit must have freedom to make its projects work in an environment confined within its borders. To properly serve its residents, a city need not comply with land regulations such as height, set-back, parking, and road access. We note that plaintiffs have not advanced any compelling arguments concerning why a different result should follow.

### B. GOVERNMENTAL FUNCTION

Plaintiffs also argue that the use of the Hannah Building Center is not in furtherance of a governmental function, but rather a proprietary function, and thus the city is bound by its zoning ordinances. We disagree.

The *Mainster* Court, "based on the decision in *Taber v Benton Harbor* [280 Mich 522; 274 NW 324 (1937)] held that a governmental unit is immune from the effect of its zoning ordinance if its use of the subject property is in the furtherance of a governmental, rather than a proprietary, function or if the proposed

governmental projects are expressly exempt by the terms of the zoning ordinance." *Keiswetter v Petoskey*, 124 Mich App 590, 594; 335 NW2d 94 (1983). The *Mainster* Court provided examples of a governmental function, including a police station, fire house, school, or municipal office. *Mainster, supra* at 327; see also *Keiswetter, supra* at 595 (training of fire fighters involves a governmental function). In *Taber, supra* at 525-526, our Supreme Court determined, under the circumstances in that case, that a waterworks system is a proprietary function.

Here, the zoning ordinance contains no provision exempting the city from the terms therein. Thus, the determining factor is whether the community center constitutes a governmental function. The evidence provided to the trial court indicates that the planned uses for the community center were to benefit the general public. The Hannah Building Center was intended to include, among other things, a senior center, teen center, auditorium, gymnasiums, cafeteria, swimming pool, locker rooms, cardiovascular/fitness area, dance and aerobic studio, performing arts rehearsal and recital space, soccer and other sports fields, and an outdoor theater, as well various meeting rooms and classrooms. Moreover, we note that plaintiffs offered no evidence contradicting the evidence that the community center was never expected to earn a profit, but rather to operate at a deficit and be supported in part by the city's general fund, and thus it clearly is not a proprietary function.[9] We hold that a community center developed and pro-

---

[9] The fact that fees and charges will exist with respect to some uses does not in itself cause the community center to be a proprietary function. In fact, defendants provided evidence that although fees and rents

vided by the city for the locality is a governmental function.

### C. OMA ISSUES

We next address the issue advanced in defendants' cross-appeal. Defendants challenge the trial court's determination that the HBC[10] was a public body that met in violation of the OMA, MCL 15.261 *et seq*. Defendants argue that the HBC was not a "public body" subject to the OMA because it was not a governing body empowered to perform a governmental function; instead, the committee was authorized to perform functions that the city staff would have performed privately. We review de novo summary-disposition decisions under MCR 2.116(A), *Wills v State Farm Ins Co*, 222 Mich App 110, 114; 564 NW2d 488 (1997), and questions of statutory construction, *Herald Co v Bay City*, 463 Mich 111, 117; 614 NW2d 873 (2000).

The OMA defines "public body" as any state or local legislative or governing body, including a committee, that is "empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . ." MCL 15.262(a). See, generally, *Herald Co, supra* at 129-133. In support of their positions, the parties here rely mainly on two Supreme Court cases applying this definition. Like the trial court, plaintiffs rely on *Booth Newspapers, Inc v Univ of Michigan Bd of Regents,*

---

would be charged, the Hannah Building Center is expected to require an additional infusion of over $300,000 a year to be supplied by the city.

[10] For purposes of analysis, we do not distinguish between the HBC and its steering committee because they exist to accomplish the same purpose and are functionally equivalent.

444 Mich 211; 507 NW2d 422 (1993), in asserting that the HBC is a public body, whereas defendants rely on the more recent *Herald Co* in arguing that the HBC is not a public body.

In *Booth Newspapers*, the University of Michigan Board of Regents appointed itself as the presidential selection committee and undertook, through delegation of authority, to choose a new university president by compiling a list of candidates and reducing the list from 250 to one. *Id.* at 215-216. In doing so, "[t]he board effectively sought to delegate its authority as a body subject to the OMA to various bodies of its own creation that it believed were not subject to the OMA, for the express purpose of avoiding the requirements of the OMA." *Herald Co, supra* at 134. Our Supreme Court noted that the selection of a president was one of the board's most important exercises of governmental authority and held that a subcommittee empowered by the board to exercise that authority was a public body under MCL 15.262(a). *Booth Newspapers, supra* at 224-226.

More recently, in *Herald Co, supra* at 114, 132-136, the Supreme Court addressed the OMA in the context of the municipal hiring process and held that a committee formed by a city manager to evaluate and recommend a fire chief was not a public body under MCL 15.262(a). The Court emphasized that the committee was created by the city manager, who was not a legislative or governing body and who was authorized by the charter to recommend a fire chief to the city commission. *Id.* at 132 n 15, 135-136. The Court concluded that, as the creation of the city manager, the committee was not " 'empowered by state constitution, statute, charter, ordinance, resolution, or

rule' " and was therefore not a public body under MCL 15.262(a). *Herald Co, supra* at 135, quoting MCL 15.262(a).

In the present case, there are aspects of the HBC that are similar to factors that the Supreme Court found significant in *Booth* and in *Herald Co*, which makes the determination of whether the HBC was a public body a close call. Defendants argue that the holding in *Herald Co* applies here because the only duties that the HBC performed were duties of the city manager and staff that would otherwise have occurred in private because under the city's charter, § 7.3(b), the city manager's duties include supervising construction and repair of all city-owned property. However, in a November 6, 1998, memorandum to the city manager, the planning director said the committee would advise the *council*. Under East Lansing Ordinance § 5.147A(6), the city council, not the city manager or staff, had the authority to approve, modify, or reject site plans, and the council exercised that authority itself; it did not delegate it to the HBC. Rather, the HBC was assigned the duties a site-plan applicant would perform: working with an architect to design a plan and presenting that plan to the city council. Moreover, the committee in this case differs significantly from that in *Herald Co, supra* at 132-136, because here the city council, rather than the city manager, appointed the committee. In *Herald Co, supra* at 135-136, the Supreme Court did not specifically state that the committee was free from OMA requirements because it performed duties usually performed by or assigned to the city manager. Rather, the Court focused on the source of the committee's power, which was its formation by the city manager.

*Id.* The Court noted that "the committee, as the creation of the city manager, did not derive its power from 'state constitution, statute, charter, ordinance, resolution, or rule . . . .' " *Id.* at 136 n 19, quoting MCL 15.262(a).

We conclude that the situation here is more akin to *Booth,* because the city council, not the city manager, by resolution created the HBC and appointed HBC members. The city council effectively authorized the HBC to perform a governmental function. Further, the HBC engaged in more than just plan development and architect and construction-manager selection. In fact, it held public meetings and solicited public input, which is more akin to a governmental body than staff. Although a close call, we agree with the trial court that the HBC was a public body subject to the OMA, MCL 15.261 *et seq.*, and therefore we find no error.

Plaintiffs also argue that the evidence establishes that the continued and repeated violations of the OMA impaired the rights of plaintiffs, as well as the public, requiring the invalidation of the approval of the plan of development and the enjoining of its implementation, and thus the trial court erred in failing to do so. We review for an abuse of discretion a trial court's decisions whether to invalidate a decision made in violation of the OMA and whether to grant or deny injunctive relief. *Nicholas v Meridian Charter Twp Bd,* 239 Mich App 525, 533, 534; 609 NW2d 574 (2000).

A court has discretion to invalidate a decision made in violation of the OMA if it finds that violation impaired the rights of the public under the OMA. MCL 15.270(2); *In re Jude,* 228 Mich App 667, 672; 578 NW2d 704 (1998). Further, the plaintiff cannot simply allege an impairment of the public's rights, *Nicholas,*

*supra* at 533, but must instead make specific factual allegations demonstrating that the public's rights were impaired, *Knauff v Oscoda Co Drain Comm'r*, 240 Mich App 485, 495; 618 NW2d 1 (2000); *In re Jude*, *supra*.

Here, although the HBC failed to provide notice of the vast majority of its meetings and although the steering committee failed to provide notice of all its meetings, the public was not completely excluded from the process. The public was invited to speak at three HBC meetings, two planning-commission hearings, a work-session meeting of the city council, and the March 21, 2000, public hearing held by the city council. Plaintiffs and other members of the public expressed their concerns regarding the site plan on all those occasions, and each decision-making body heard their concerns. At the March 21, 2000, city-council meeting, which continued into the early morning hours, members of the public, including many of the plaintiffs, and council members discussed the proposed plan, including parking issues, at length before the council approved the plan. Under these circumstances, plaintiffs had a reasonable opportunity to learn about the community-center site plans and to voice their concerns and opposition. Therefore, we cannot say that the trial court abused its discretion in refusing to invalidate the plan of development and in failing to grant injunctive relief.

Additionally, plaintiffs argue that pursuant to the OMA, they are entitled to an award of the costs that they incurred for deposition transcripts.[11] We dis-

---

[11] We note that the trial court properly granted plaintiffs attorney fees and other costs. Where a trial court declares that the defendants violated

agree. We review de novo questions of statutory interpretation. *Herald Co, supra* at 117.

Although MCL 15.271(4) provides that if relief is obtained in an action against a public body for not complying with the OMA, that relief shall include "court costs and actual attorney fees," we conclude, as did the trial court, that the deposition costs in the instant case are not included in that relief. Pursuant to MCL 600.2401, "[w]hen costs are allowed in *any action or proceeding* in . . . the circuit court . . . the items and amount thereof shall be governed by this chapter except as otherwise provided in this act" (emphasis added). MCL 600.2549 provides in relevant part that costs may not be awarded for depositions not filed with the clerk. *Rickwalt v Richfield Lakes Corp*, 246 Mich App 450, 465; 633 NW2d 418 (2001); *Elia v Hazen*, 242 Mich App 374, 380-382; 619 NW2d 1 (2000). Because the depositions in question were not filed with the clerk, plaintiffs were not entitled to deposition costs.

### D. DELEGATION OF AUTHORITY

Finally, we address plaintiffs' challenge to the trial court's dismissal of their claim of unlawful delegation of authority. Because the parties submitted this claim to the trial court on stipulated facts, MCR 2.116(A), our review is de novo. *Wills, supra* at 114.

Where the delegating entity retains the ultimate decision-making authority, the delegation is lawful. *Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 221 Mich App 103, 120; 561 NW2d 433

the OMA, but finds it unnecessary to grant injunctive relief, the plaintiffs are entitled to actual attorney fees and costs. *Nicholas, supra* at 535.

(1997), rev'd on other grounds 460 Mich 75; 594 NW2d 491 (1999); see also *Attorney Gen v Guy*, 334 Mich 694, 705; 55 NW2d 210 (1952) (a city council did not unlawfully delegate its authority when it sought a recommendation, but retained the authority to decide whether to act on the recommendation); cf. *Herald, supra* at 132 & n 15.

Here, plaintiffs do not dispute that the city council retained the final decision-making authority, but continue to challenge the HBC's conduct, including its acts and omissions in arriving at its recommendation. Because the city council did not delegate the final decision-making authority, the delegation was proper.[12] *Federated Publications, supra; Attorney Gen, supra.*

Affirmed.

---

[12] To the extent that plaintiffs argue that the trial court improperly concluded that it had no authority to invalidate and enjoin the city's unlawful delegation of authority, we find it unnecessary to reach that issue because there was no improper delegation of authority.