DAVIS v CITY OF DETROIT FINANCIAL REVIEW TEAM

McNEIL v CITY OF DETROIT FINANCIAL REVIEW TEAM

Docket Nos. 309218, 309250, and 309482. Submitted May 3, 2012, at Lansing. Decided May 21, 2012, at 9:00 a.m.

Robert Davis and Edward McNeil brought separate actions in the Ingham Circuit Court against the City of Detroit Financial Review Team, the Governor, and the State Treasurer, asserting that defendants had violated the Open Meetings Act (OMA), MCL 15.261 et seq. Davis sought a declaratory judgment, which the court, William E. Collette, J., granted, holding that the Detroit Financial Review Team, which was created under the Local Government and School District Fiscal Accountability Act, MCL 141.1501 et seq., commonly known as the emergency financial manager act (EFMA), was a public body subject to the provisions of the OMA and that it had violated the OMA in several ways. The trial court also granted Davis's motion for a permanent injunction barring defendants from violating the OMA. Defendants appealed (Docket No. 309218). After the trial court granted his motion for a permanent injunction, Davis filed an ex parte motion for civil contempt and order to show cause why defendants should not be held in contempt for allegedly establishing a subcommittee that would violate the trial court's earlier order. Davis distributed subpoenas to each of the team members, requiring them to appear at the show-cause hearing. Defendants moved to quash the subpoenas. Following the hearing on defendants' motion, the court ordered defendants' counsel to produce five members of the Detroit Financial Review Team at the show-cause hearing and ordered the Detroit Financial Review Team and the State Treasurer not to execute or sign a consent agreement or its equivalent with the city of Detroit, the Detroit City Council, or the Mayor of Detroit until further order of the court. Defendants filed an emergency application for leave to appeal (Docket No. 309250). By order, the Court of Appeals reversed that portion of the trial court's order that had precluded defendants from executing a consent agreement, stayed the remainder of the trial court's order, held the application for leave to appeal in abeyance, retained jurisdiction, and gave its order immediate effect. The Court of

Appeals subsequently granted defendants' application for leave to appeal, consolidated the appeals in Docket Nos. 309218 and 309250, set an expedited briefing schedule, retained jurisdiction, and again gave its order immediate effect. McNeil subsequently filed his complaint and moved for preliminary injunctive relief, alleging that the State Treasurer had been negotiating a consent agreement with the city of Detroit in violation of the OMA and that the Detroit Financial Review Team's report on the city of Detroit's finances was based on meetings that were held in violation of the OMA. The trial court issued a temporary restraining order and order to show cause, concluding that McNeil was likely to succeed on the merits of his claim that defendants had violated the OMA, and ordered a show-cause hearing concerning why the court should not grant a preliminary injunction enjoining defendants from taking any action regarding the city of Detroit in violation of the OMA. Defendants filed an emergency application for leave to appeal and application for stay (Docket No. 309482). The Court of Appeals granted the application for leave to appeal, granted the stay, consolidated the appeal with the appeals in Docket Nos. 309218 and 309250, set an expedited briefing schedule, retained jurisdiction, and again gave its order immediate effect.

The Court of Appeals *held*:

1. The OMA generally requires that the decisions and deliberations of a public body be open to the public. The OMA defines a "public body" as any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function. An individual executive acting in his or her executive capacity is not a public body for purposes of the OMA. The statutory terms used illustratively to define "public body" do not encompass individuals, and it would be beyond awkward to apply the OMA to an individual. Thus, the State Treasurer, when acting in his or her executive capacity with authority either generally derived from the Constitution or specifically derived from statute, is not a public body subject to the OMA.

2. To be a public body under the OMA, the entity at issue must be a state or local legislative or governing body that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function. That a body exercises governmental authority is not itself dispositive of whether it is a public body; the body must also be a legislative or governmental

body. Under the EFMA, under certain conditions, the State Treasurer, as the state financial authority of a municipal government, may conduct a preliminary review of a municipality's financial problems. If the State Treasurer makes a finding of probable financial stress, the Governor must appoint a financial review team for that municipal government. The Detroit Financial Review Team was a state body given that the EFMA authorized its creation and the Governor appointed the members of the team pursuant to the EFMA. However, the Detroit Financial Review Team was not empowered to make or enact law, to bring something into or out of existence by making law, or to attempt to bring about or control by legislation. And while the EFMA gives the state financial authority rulemaking authority, it does not give rulemaking authority to financial review teams. Accordingly, the Detroit Financial Review Team was not a legislative body. In determining whether a financial review team is a governing body under the OMA, a court must consider the authority or function which the EFMA empowers a financial review team to exercise or perform. Under the EFMA, a financial review team is empowered to examine the books and records of the local government, use services of other state agencies and employees, negotiate and sign a consent agreement with the chief administrative officer of the local government if approved by resolution of the governing body of the local government and approved and executed by the State Treasurer acting as the state financial authority for a municipal government, meet with the local government and receive, discuss, and consider information provided by the local government concerning the financial condition of the local government, and report its findings to the Governor, with a copy to the state financial authority; the report must include the existence, or an indication of the likely occurrence, of criteria relating to the financial condition of a local government, and the report must include one of four conclusions concerning the financial conditions of the local government. A financial review team may also appoint an individual or firm to carry out the review and submit a report to the review team for approval with the approval of the state financial authority, issue subpoenas and administer oaths to certain enumerated individuals and entities under certain circumstances, and file an action in a circuit court to compel testimony and the furnishing of records and documents under certain circumstances. To be a governing body under the OMA, an entity must be self-governing or independent, in that it makes or administers public policy for a political unit or exercises independent authority, and it must have the power to make decisions, which the OMA defines as a determination, action, vote, or disposition upon a

motion, proposal, recommendation, resolution, order, ordinance, bill or measure by which a public body effectuates or formulates public policy. The authority and functions of a financial review team under the EFMA do not empower it to independently govern through decision-making that effectuates or formulates public policy. While a financial review team may make recommendations, it does not act upon those recommendations. Accordingly, a financial review team is not a legislative or governing body and, therefore, is not a public body under the OMA.

3. A public body may not delegate its authority to subunits of individual members in order to evade the OMA. However, given that the Detroit Financial Review Team was not itself a public body, the State Treasurer, even if he acted as a one-man committee of that financial review team, was not a public body exercising governmental authority and, thus, was not subject to the strictures of the OMA.

4. Declaratory relief normally will suffice to induce the legislative and executive branches to conform their actions to constitutional requirements or confine them within constitutional limits. Only when declaratory relief has failed should the courts even begin to consider additional forms of relief, such as injunctive relief. An injunction represents an extraordinary and drastic use of judicial power that should be employed sparingly. In determining whether to issue an injunction, a court should consider: (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued. Because there was no likelihood that plaintiffs would prevail on the merits, no showing of irreparable harm, and no showing that declaratory relief had failed, the trial court improperly granted injunctive relief in these cases.

5. A party to litigation must obey an order entered by a court with proper jurisdiction even if the order is clearly incorrect. Accordingly, the Detroit Financial Review Team was required to obey the trial court's orders requiring it to adhere to the OMA as long as those orders remained in effect and had not been stayed or reversed on appeal. Thus, remand for further proceedings regarding possible civil contempt by defendants was required.

Trial court rulings issuing injunctive relief reversed; both cases remanded to the trial court for entry of judgment in defendants' favor on the merits of the OMA claims brought by Davis and

McNeil; *Davis* also remanded for an evidentiary hearing on Davis's allegations that various state officials and members of the Detroit Financial Review Team were in contempt of court.

O'CONNELL, J., concurring in part and dissenting in part, concurred with the majority that the Detroit Financial Review Team was not subject to the OMA and that the Governor and State Treasurer, being individual executive branch officeholders, were not subject to the strictures of the OMA in these cases, but wrote separately to emphasize that an injunction against a coequal branch of government should be an extremely rare remedy, available only after a party has definitively established that a declaratory judgment has been ineffective, and that our governmental system turns on a respectful balance of power among the three branches of government. These tenets precluded remand, and Judge O'CONNELL accordingly would have reversed all of the trial court's rulings in their entirety.

1. STATUTES — OPEN MEETINGS ACT — PUBLIC BODIES — INDIVIDUAL EXECUTIVES — STATE TREASURER.

The Open Meetings Act (OMA) defines a "public body" as any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function; an individual executive acting in his or her executive capacity is not a public body for purposes of the OMA; thus, the State Treasurer, when acting in his or her executive capacity with authority either generally derived from the Constitution or specifically derived from statute, is not a public body under the OMA (MCL 15.262[a]).

2. STATUTES — OPEN MEETINGS ACT — PUBLIC BODIES — FINANCIAL REVIEW TEAMS.

To be a public body under the Open Meetings Act (OMA), the entity at issue must be a state or local legislative or governing body that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function; that an entity exercises governmental authority is not itself dispositive of whether it is a public body; the entity must also be a legislative or governing body; a financial review team appointed under the Local Government and School District Fiscal Accountability Act is not a legislative or governing body and, therefore, is not a public body under the OMA (MCL 15.261 *et seq.*, MCL 141.1501 *et seq.*).

3. DECLARATORY JUDGMENTS — LEGISLATIVE AND EXECUTIVE BRANCHES OF GOV-
   ERNMENT — INJUNCTIVE RELIEF.

   Declaratory relief normally will suffice to induce the legislative and
   executive branches to conform their actions to constitutional
   requirements or confine them within constitutional limits; only
   when declaratory relief has failed should the courts even begin to
   consider additional forms of relief, such as injunctive relief.

4. INJUNCTIONS — STANDARD.

   An injunction represents an extraordinary and drastic use of judicial
   power that should be employed sparingly; in determining whether
   to issue an injunction, a court should consider: (1) the likelihood
   that the party seeking the injunction will prevail on the merits, (2)
   the danger that the party seeking the injunction will suffer
   irreparable harm if the injunction is not issued, (3) the risk that
   the party seeking the injunction would be harmed more by the
   absence of an injunction than the opposing party would be by the
   granting of the relief, and (4) the harm to the public interest if the
   injunction is issued.

*Andrew A. Paterson* and *Carl J. Marlinga* for Robert Davis.

*Miller Cohen, P.L.C.* (by *Richard G. Mack, Jr., Robert D. Fetter,* and *Keith D. Flynn*), for Edward McNeil.

*Bill Schuette,* Attorney General, *John J. Bursch,* Solicitor General, *B. Eric Restuccia,* Deputy Solicitor General, *Richard A. Bandstra,* Chief Legal Counsel, and *Michelle M. Brya,* Assistant Attorney General, for the City of Detroit Financial Review Team, the Governor, and the State Treasurer.

Before: WHITBECK, P.J., and O'CONNELL and M. J. KELLY, JJ.

WHITBECK, P.J. These consolidated appeals involve the relationship between the Open Meetings Act[1] and the Local Government and School District Fiscal Account-

[1] MCL 15.261 *et seq.*

ability Act,[2] commonly known as the emergency finan-
cial manager act. The central issue in these cases is
whether a financial review team that the Governor
appoints under § 12(3) of the emergency financial man-
ager act[3] is a "public body," as § 2(a) of the Open
Meetings Act[4] defines that term. We conclude that a
financial review team—and therefore the Detroit Fi-
nancial Review Team—is not a public body, because it is
not a "governing body" as the Open Meetings Act uses
that term. And we therefore also conclude that the
State Treasurer, whether acting in his executive capac-
ity or as a "one man committee" of the Detroit Finan-
cial Review Team, is not a "public body."

We further conclude that the trial court abused its
discretion by granting injunctive relief through its
various rulings and orders in the proceedings below, in
two major ways. First, the trial court failed to apply
controlling legal principles in determining that the
Detroit Financial Review Team was a public body.
Second, the trial court erred by finding that there would
be *per se* irreparable harm to the people if it did not
grant injunctive relief.

Thus, in *Davis v Detroit Financial Review Team*
(Docket No. 309218), we reverse the trial court's orders
granting declaratory and injunctive relief to Davis and
remand the case to the trial court for entry of judgment
in favor of defendants regarding the merits of the case.
Similarly, in *McNeil v Detroit Financial Review Team*
(Docket No. 309482), we reverse the trial court's order
granting a show-cause hearing concerning McNeil's
claim under the Open Meetings Act and remand for
entry of judgment in favor of defendants. However, in

---

[2] MCL 141.1501 *et seq.*

[3] MCL 141.1512(3).

[4] MCL 15.262(a).

*Davis v Detroit Financial Review Team* (Docket No. 309250), we remand the case for further proceedings regarding Davis's motion for civil contempt.

### I. BASIC FACTS

#### A. THE EMERGENCY FINANCIAL MANAGER ACT

The emergency financial manager act became effective March 16, 2011.[5] The emergency financial manager act provides that, when certain conditions are met, the State Treasurer, as the "state financial authority" of a municipal government, may conduct a preliminary review of a municipality's financial problems.[6]

If the State Treasurer makes a finding of "probable financial stress," the Governor must appoint a review team for that municipal government.[7] The review team for a municipal government must include the State Treasurer or his or her designee; the Director of the Department of Technology, Management, and Budget or his or her designee; a nominee of the Senate Majority Leader; and a nominee of the Speaker of the House of Representatives.[8] But the Governor may also appoint other state officials or "other persons with relevant professional experience to serve on a review team to undertake a municipal financial management review."[9]

Under the emergency financial manager act, the review team has the power to examine the books and records of the local government, utilize the services of other state agencies and employees, and negotiate and

---

[5] MCL 141.1501 *et seq*. This act is also sometimes referred to as "Act 4" because of its public act number, that is, 2011 PA 4.

[6] MCL 141.1505(k)(*i*); MCL 141.1512(1).

[7] MCL 141.1512(3).

[8] *Id.*

[9] *Id.*

sign a consent agreement with the chief administrative officer of the local government.[10] However, for such a consent agreement with a municipal government to go into effect, it must be approved by resolution of the governing body of the local government and be approved and executed by the State Treasurer.[11]

Importantly, the review team must meet with the local government as part of its review.[12] At this meeting or meetings, the review team is to receive, discuss, and consider information provided by the local government concerning the financial condition of the local government.[13] The review team must report its findings to the Governor within 60 days following its appointment, although the Governor may grant one 30-day extension to this limit.[14] Within 10 days after receipt of the report of the review team, the Governor must make a determination whether a financial emergency exists and how to proceed.[15] A financial emergency can be resolved either through a consent agreement or the appointment of an emergency manager.[16]

### B. OPEN MEETINGS ACT

The Open Meetings Act[17] generally requires "decisions" or "deliberations" of a "public body" to be open to the public.[18] The Open Meetings Act allows individu-

[10] MCL 141.1513(1).

[11] MCL 141.1513(1)(c).

[12] MCL 141.1513(2).

[13] *Id.*

[14] MCL 141.1513(3).

[15] MCL 141.1515.

[16] *Id.*

[17] MCL 15.261 *et seq.*

[18] MCL 15.262; MCL 15.263.

als to bring civil actions for injunctive relief to either compel compliance or enjoin further noncompliance.[19]

The Open Meetings Act defines the term "public body" for its purposes to include

> any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . .[20]

The Open Meetings Act defines a "meeting," in part, as "the convening of a public body at which a quorum is present for the purpose of deliberating toward or rendering a decision on a public policy . . . ."[21] And the Open Meetings Act defines a "decision" as a "determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy."[22]

C. DOCKET NO. 309218

On December 21, 2011, State Treasurer Andy Dillon provided Governor Rick Snyder with a preliminary review, concluding that probable financial stress existed in the city of Detroit. On December 27, 2011, the Governor appointed the Detroit Financial Review Team. The Governor subsequently granted the financial review team a 30-day extension.

---

[19] MCL 15.271.

[20] MCL 15.262(a).

[21] MCL 15.262(b).

[22] MCL 15.262(d).

On February 1, 2012, Robert Davis filed a complaint in the Ingham Circuit Court, seeking a declaratory judgment and injunctive relief based on his assertions that defendants—the Detroit Financial Review Team, the Governor, and the State Treasurer—had violated multiple provisions of the Open Meetings Act. Davis later filed an emergency motion for declaratory judgment and injunctive relief, and defendants moved for summary disposition. The trial court heard arguments on February 6 and February 15, 2012, and made rulings from the bench that it incorporated into two orders, one that it issued on February 6, 2012, and the other that it issued on February 29, 2012.

In the February 29, 2012 order, the trial court granted Davis's motion for declaratory judgment, denied defendants' motion for summary disposition, and granted Davis's motion for a permanent injunction barring defendants from violating any and all provisions of the Open Meetings Act. The trial court also held that the Detroit Financial Review Team was a public body subject to the provisions of the Open Meetings Act and that the Detroit Financial Review Team had violated the act by (1) failing to hold its January 10, 2012, meeting in public, (2) failing to keep minutes of the January 10, 2012, meeting and failing to provide Davis with a copy of the minutes, (3) failing to post notice of the January 10, 2012, meeting, and (4) meeting in closed session for impermissible purposes on January 10, 2012.

The trial court further held that the Detroit Financial Review Team violated the Open Meetings Act by holding a private meeting with the Detroit Mayor and other city officials and by meeting in closed session on January 17, 2012. The trial court awarded costs and attorney fees to Davis. The trial court dismissed the

matter with prejudice and retained jurisdiction only for the purpose of enforcement. The trial court denied defendants' motion for a stay of proceedings and closed the case.

On March 21, 2012, defendants filed a claim of appeal from the trial court's February 29, 2012, order. Defendants have subsequently stated that, although they dispute the correctness of the trial court's decision, they have conducted subsequent meetings of the Detroit Financial Review Team in conformance with the Open Meetings Act.

### D. DOCKET NO. 309250

On March 1, 2012, Davis filed in the trial court an ex parte motion for civil contempt and order to show cause why defendants should not be held in contempt for establishing a subcommittee that would violate the trial court's February 29, 2012, order. The trial court issued a show-cause order on March 1, 2012, requiring all 10 members of the Detroit Financial Review Team to appear for a show-cause hearing on March 12, 2012. Defendants moved for reconsideration of that order. They asserted that the subcommittee had yet to meet and that advisory committee meetings do not violate the Open Meetings Act. In two orders issued March 8, 2012, the trial court adjourned the show-cause hearing and denied defendants' motion for reconsideration.

On March 9, 2012, Davis noticed a show-cause hearing in the trial court, supported by affidavits from him and his counsel, indicating that there were additional questions that defendants had not answered. On March 13, 2012, the trial court scheduled the show-cause hearing for March 22, 2012. Defendants assert that the trial court directed Davis's counsel to provide defendants' counsel with a list of witnesses that he

wished to present at the March 22, 2012, hearing. However, at a March 13, 2012, public meeting of the Detroit Financial Review Team, Davis's counsel distributed subpoenas to each of the team members, requiring them to appear at the show-cause hearing.

Defendants filed an emergency motion in the trial court to quash the subpoenas and to hold Davis's counsel in contempt for failing to follow the trial court's direction concerning witnesses. The trial court held a hearing on the motion on March 20, 2012. At the hearing, Davis represented that defendants continued to violate the Open Meetings Act when the State Treasurer allegedly met individually with Detroit City Council members and the Mayor's staff, allegedly exchanged drafts of documents, and allegedly negotiated for the Detroit Financial Review Team. Davis asserted that the State Treasurer acted as a member of the Detroit Financial Review Team and that he was in contempt of court.

The trial court indicated that, at a prior hearing, it had informed the parties that the appointment of a subcommittee to do the job of the Detroit Financial Review Team would be a violation of the Open Meetings Act. The trial court further stated that it would not allow the Detroit Financial Review Team to approve any agreement until the trial court was satisfied that there was proper adherence to the Open Meetings Act.

After the hearing, the trial court issued its March 20, 2012, order. In that order, the trial court adjourned the show-cause hearing to March 29, 2012, and ordered defendants' counsel to produce five members of the Detroit Financial Review Team (including the State Treasurer) to provide testimony at the show-cause hearing. The trial court further ordered the Detroit Financial Review Team and the State Treasurer not to

execute or sign a consent agreement or its equivalent with the city of Detroit, Detroit City Council, or the Mayor of Detroit until further order of the trial court. The March 20, 2012, order also required the parties to provide each other with any additional witnesses they intended to call and for the State Treasurer to produce all documents requested in Davis's subpoena, unless previously supplied. On March 22, 2012, the trial court denied defendants' emergency motion for stay. On the same day, defendants filed their emergency application for leave to appeal with this Court.

On March 22, 2012, this Court issued its order granting defendants' motion for immediate consideration, holding the application for leave and the motion for stay in abeyance, and requiring Davis to file responsive pleadings. After Davis filed his responsive pleadings, on March 23, 2012, this Court issued its order, reversing that part of the trial court's order of March 20, 2012, that precluded defendants from executing a consent agreement. This Court held that § 10 of the Open Meetings Act[23] did not authorize the trial court to bar further actions by the defendants in the absence of a finding of continued violations of the act. This Court also stayed all other aspects of the trial court's March 20, 2012, order, held defendants' application for leave in abeyance, retained jurisdiction, and gave the order immediate effect.

On March 27, 2012, this Court issued its order granting defendants' application for leave to appeal, consolidating Docket No. 309250 with Docket No. 309218, setting an expedited briefing schedule, continuing to retain jurisdiction, and giving the order immediate effect.

[23] MCL 15.270.

E. DOCKET NO. 309482

On March 29, 2012, Edward McNeil filed a complaint and motion for preliminary injunctive relief against the same defendants as in the *Davis* litigation (Docket Nos. 309250 and 309218) previously described. The complaint alleged that the Detroit Financial Review Team, specifically the State Treasurer, had been negotiating a consent agreement in violation of the Open Meetings Act and that the Detroit Financial Review Team's report was based on meetings that were held in violation of the Open Meetings Act. McNeil sought a temporary restraining order prohibiting defendants from taking any further actions under the emergency financial manager act and from acting on the Detroit Financial Review Team's March 26, 2012, report.

On March 30, 2012, the trial court, without hearing from defendants, issued a temporary restraining order and order to show cause, which found, among other things, that McNeil was likely to succeed on the merits of the claims that defendants had violated the Open Meetings Act. Somewhat confusingly, the trial court also ordered that McNeil's motion for a temporary restraining order and order to show case be "held in abeyance" because McNeil was entitled to a hearing on that motion. The trial court ordered that a show-cause hearing take place on April 9, 2012, regarding why the trial court should not grant the preliminary injunction enjoining defendants from taking any action regarding the city of Detroit in violation of the Open Meetings Act. As of April 4, 2012, four Detroit Financial Review Team members were served with subpoenas to appear and produce documents at the April 9, 2012, show-cause hearing.

On April 4, 2012, defendants filed an emergency application for leave to appeal and application for stay

with this Court. After McNeil filed his responsive pleadings, on April 5, 2012, this Court issued its order granting the application for leave to appeal. This Court also granted the stay, consolidated this appeal with the appeals in the *Davis* litigation, set an expedited briefing schedule, retained jurisdiction, and gave the order immediate effect.

After receiving and reviewing briefs from all the parties in these consolidated appeals, this Court heard oral argument on May 4, 2012.

## II. THE OPEN MEETINGS ACT AND FINANCIAL REVIEW TEAMS

### A. OVERVIEW

The main thrust of the arguments of Davis and McNeil in these consolidated appeals is that the State Treasurer and the Detroit Financial Review Team, acting under the authority of the emergency financial manager act, violated the Open Meetings Act. At the core of this argument is the assertion that the State Treasurer and the Detroit Financial Review Team are "public bodies" subject to the Open Meetings Act.[24] Although complex, this is a narrow question. We therefore do not address the question whether the emergency financial manager act is sound public policy, either in the short term or in the long term. Such public policy matters are for the Legislature, and not this Court, to decide.[25] We also do not address the question whether the consent agreement/financial stability agreement that was ultimately entered into was a good idea or a

[24] MCL 15.262(a).

[25] *Tyler v Livonia Pub Schs*, 459 Mich 382, 393 n 10; 590 NW2d 560 (1999) ("Our role as members of the judiciary is not to determine whether there is a 'more proper way,' that is, to engage in judicial legislation, but is rather to determine the way that was in fact chosen by the Legislature. It is the Legislature, not we, who are the people's representatives and authorized to decide public policy matters such as this.").

bad idea. And, in particular, we do not address the assertion that a financial review team acting under the authority of the emergency financial manager act *should* be subject to the Open Meetings Act and therefore *should* hold its meetings in public. We only address the question whether the Open Meetings Act *requires* that such a financial review team hold its meetings in public. In short, we deal not with what *should be*, but with what *is*.

As we outline later in this opinion, we conclude that the meetings of a financial review team—and therefore the Detroit Financial Review Team—are not covered by the Open Meetings Act. We hold that such a financial review team is not a "governing body" and, therefore, not a "public body" as the Open Meetings Act uses these terms. We reach that decision because we conclude, after examining the authority and functions of a financial review team and analyzing them within the framework of the Open Meetings Act, that the emergency financial manager act does not empower a financial review team (1) as a "governing body" (2) to exercise independent governmental or proprietary authority or (3) to perform an independent governmental or proprietary function, (4) either one of which results in independent decision-making that effectuates or formulates public policy. We also hold that the State Treasurer, whether acting in his executive capacity or as a "one man committee" of the Detroit Financial Review Team, is not a "public body."

### B. STANDARD OF REVIEW

This Court reviews de novo issues of statutory construction.[26] "The Legislature is presumed to have in-

---

[26] *Driver v Naini*, 490 Mich 239, 246; 802 NW2d 311 (2011).

tended the meaning it has plainly expressed,"[27] and clear statutory language must be enforced as written.[28] However, when a statute is ambiguous, "this Court's goal is to effectuate the Legislature's intent through a reasonable construction, considering the purpose of the statute and the object sought to be accomplished."[29]

### C. THE STATE TREASURER AS A "PUBLIC BODY"

#### 1. PRELIMINARY MATTERS

Davis and McNeil sued the State Treasurer in his official capacity as the duly appointed Treasurer for the State of Michigan and in his official capacity as a member of the Detroit Financial Review Team. Davis and McNeil have also asserted that the State Treasurer acted as a "one man committee" in this matter. We will consider each allegation in turn.

It is appropriate to note that Davis and McNeil also sued the Governor in somewhat the same fashion. But on appeal, Davis and McNeil have made no further argument regarding the Governor's role in this case. A party may not leave it to this Court to discover and rationalize the basis for his or her claims,[30] nor may a party give issues cursory treatment with little or no citation of supporting authority.[31] And a party's failure to properly address the merits of an assertion constitutes abandonment of the

---

[27] *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 219; 731 NW2d 41 (2007) (quotation marks and citation omitted).

[28] *Fluor Enterprises, Inc v Dep't of Treasury*, 477 Mich 170, 174; 730 NW2d 72 (2007).

[29] *Tull v WTF, Inc*, 268 Mich App 24, 31; 706 NW2d 439 (2005).

[30] *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998).

[31] *In re Application of Indiana Mich Power Co*, 275 Mich App 369, 376; 738 NW2d 289 (2007).

issue.[32] We therefore hold that Davis and McNeil have abandoned any claims against the Governor.

### 2. THE STATE TREASURER ACTING IN HIS EXECUTIVE CAPACITY

Turning first to whether an individual acting in an executive capacity can constitute a "public body" as the Open Meetings Act defines that term, the leading case on this subject is *Herald Co v Bay City*.[33] That case involved the issue whether a city manager—a single individual—constituted a "public body" in connection with a city charter provision that provided for the city commission to appoint a new fire chief on the recommendation of the city manager.[34] The Michigan Supreme Court observed that, as used in the Open Meetings Act, the term "public body" connotes a collective entity and that

> [t]he statutory terms used illustratively to define "public body"—"legislative body" and "governing body"—do not encompass individuals. A single individual is not commonly understood to be akin to a "board," "commission," "committee," "subcommittee," "authority," or "council"—the bodies specifically listed in the act by the Legislature.[35]

The Supreme Court went on to note that other statutes, specifically the Freedom of Information Act,[36] define public bodies in such a way as to encompass individuals.[37] The clear inference is that the Legislature

---

[32] *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002).

[33] *Herald Co v Bay City*, 463 Mich 111; 614 NW2d 873 (2000), modified on other grounds in *Mich Federation of Teachers & Sch Related Personnel, AFT, AFL-CIO v Univ of Mich*, 481 Mich 657 (2008).

[34] *Id.* at 115.

[35] *Id.* at 129-130.

[36] MCL 15.231 *et seq.*

[37] *Herald Co*, 463 Mich at 130, citing MCL 15.232(d).

deliberately chose *not* to use a definition encompassing individuals when it enacted the Open Meetings Act. Further, the Court observed that it would be "awkward, to say the least," to apply the Open Meetings Act to an individual and concluded by stating:

> Perhaps the strongest common-sense basis for conclud-ing that an individual was not contemplated by the Legis-lature as a "public body" is to consider how odd a concept it would be to require an individual to "deliberate" in an open meeting. Thus, we conclude that an individual execu-tive acting in his executive capacity is not a public body for the purposes of the [Open Meetings Act].[38]

It is plain that this analysis applies directly to the State Treasurer as an individual executive acting alone in his executive capacity. It would be beyond "awkward" to envision that the State Treasurer, while acting, for example, in his executive capacity as the "state finan-cial authority" of a local government and conducting a preliminary review to determine the existence of a local governmental financial problem,[39] was at that moment subject to the Open Meetings Act as a "public body"[40] when conducting a "meeting" in which he, and he alone, was "deliberating toward or rendering" a "deci-sion" on a "public policy" matter[41] that "effectuates or formulates public policy" on which "a vote by members of a public body is required . . . ."[42]

Such a tortured, and tortuous, process is clearly outside the framework of the Open Meetings Act. As the Supreme Court stated in *Herald Co*, "an individual executive acting in his executive capacity is not a public

---

[38] *Herald Co*, 463 Mich at 130-131 (citations omitted).

[39] MCL 141.1512(1).

[40] MCL 15.262(a).

[41] MCL 15.262(b).

[42] MCL 15.262(d).

body for the purposes of the [Open Meetings Act]."[43] We therefore hold that the State Treasurer when acting in his executive capacity with authority either generally derived from the Constitution or specifically derived from statute is not a public body subject to the Open Meetings Act.

### 3. THE STATE TREASURER ACTING AS A "ONE MAN COMMITTEE" OF THE DETROIT FINANCIAL REVIEW TEAM

Davis and McNeil also assert that the State Treasurer met with various Detroit officials and other city leaders, and negotiated part or all of the consent agreement/financial stability agreement that the Detroit Financial Review Team ultimately signed in this matter. The emergency financial manager act clearly authorizes a financial review team to "[n]egotiate and sign a consent agreement with the chief administrative officer of the local government."[44] If State Treasurer Dillon was in fact a "one man committee" negotiating with Detroit officials on behalf of the Detroit Financial Review Team, this may call into play the Supreme Court's decision in *Booth Newspapers, Inc v University of Michigan Board of Regents*.[45]

In *Booth Newspapers*, the University of Michigan Board of Regents attempted to evade the requirements

---

[43] *Herald Co*, 463 Mich App at 131. See also *A&E Parking v Detroit Metro Wayne Co Airport Auth*, 271 Mich App 641, 651; 723 NW2d 223 (2006) (stating that the chief executive officer of an airport authority was not a public body under the Open Meetings Act); *Craig v Detroit Pub Sch Chief Executive Officer*, 265 Mich App 572, 579-580; 697 NW2d 529 (2005) (stating that the chief executive officer of the Detroit Public Schools was not a public body because he was an individual acting in his official capacity).

[44] MCL 141.1513(1)(c).

[45] *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211; 507 NW2d 422 (1993).

of the Open Meetings Act. Among other things, it
entrusted one regent with the authority to make the
"first cut" in the candidate list for the position of
president of the university.[46] As the majority in *Booth
Newspapers* elaborated:

> The Presidential Selection Committee [consisting of the
> eight-member Board of Regents] entrusted Regent [Paul
> W.] Brown with sole authority to make the first cut, and he
> did so after numerous telephone calls and meetings with
> the advisory committees and informal subquorum groups
> of regents. The acknowledged purpose of the telephone
> calls and subquorum meetings was to achieve the same
> intercommunication that could have been achieved in a full
> board meeting. During this process, the board avoided
> quorum meetings because it would have been required to
> conduct a public meeting under the [Open Meetings
> Act].[47]

The board of regents argued that Regent Brown's
actions did not constitute that of a subcommittee.
Therefore, the board asserted, his actions fell outside
the reach of the Open Meetings Act.[48] The majority in
*Booth Newspapers* did not find this argument persua-
sive and was concerned that it carried with it the
potential for undermining the Open Meetings Act.[49]
The majority stated:

> Essentially, the board argues form over substance. The
> Legislature did not grant any exception to specific types or
> forms of committees. Therefore, delegating the task of
> choosing a public university president to a one-man com-
> mittee, such as Regent Brown, would warrant the finding
> that this one-man task force was in fact a public body. As
> the *Goode* Court observed, "[w]e do not find the question of

---

[46] *Id.* at 216.

[47] *Id.*

[48] *Id.* at 225-226.

[49] *Id.* at 226.

whether a multi-member panel or a single person presides
to be dispositive. Such a distinction carries with it the
potential for undermining the Open Meetings Act . . . ."[50]

The majority went on to hold that the "selection of a
public university president constitutes the exercise of
government authority, regardless of whether such au-
thority was exercised by Regent Brown, the nominating
committee, the full board, or even subcommittees."[51]
Accordingly, the majority held that this "individual,"
referring to Regent Brown, or these entities must be
deemed to be public bodies within the scope of the Open
Meetings Act.[52]

But, importantly, in *Herald Co* the Supreme Court
later explained that the individual member of the public
body in *Booth Newspapers*—Regent Brown—was distin-
guishable from an individual executive. The majority in
*Herald Co* explained that, in *Booth Newspapers*, there
was a public body in the first instance—the board of
regents—that impermissibly attempted to delegate its
authority to subunits of individual members in an attempt
to evade the Open Meetings Act.[53] Thus, the question of
whether the State Treasurer acted as a "one man
committee" of the Detroit Financial Review Team when
he allegedly met with various Detroit officials and
leaders and negotiated part or all of the consent
agreement/financial stability agreement, turns on
whether the Detroit Financial Review Team itself is a
public body under the Open Meetings Act. If the Detroit
Financial Review Team is not itself a public body, then the
State Treasurer, as a "one man committee" of that finan-
cial review team, could not himself be a public body under

---

[50] *Id.*, quoting *Goode v Dep't of Social Servs*, 143 Mich App 756, 759;
373 NW2d 210 (1985) (alteration in original).

[51] *Booth Newspapers*, 444 Mich at 226.

[52] *Id.*

[53] *Herald Co*, 463 Mich at 135 n 18.

the Open Meetings Act. We thus turn to the question of whether the Detroit Financial Review Team is a public body within the meaning of the Open Meetings Act.[54]

### D. A FINANCIAL REVIEW TEAM AS A "PUBLIC BODY"

#### 1. THE STATUTORY REQUIREMENTS ACCORDING TO *HERALD CO*

As outlined in *Herald Co*, the definition of a "public body" in the Open Meetings Act contains two require-ments.[55] "First, the entity at issue must be a 'state or local legislative or governing body, including a board, commis-sion, committee, subcommittee, authority, or council.' "[56] Second, the entity must be "empowered by state consti-tution, statute, charter, ordinance, resolution, or rule to exercise governmental or propriety authority or perform a governmental or proprietary function[.]"[57]

#### 2. THE DETROIT FINANCIAL REVIEW TEAM AS A LEGISLATIVE BODY

It is clear that the Detroit Financial Review Team is a state body. The emergency financial manager act authorized the creation of financial review teams and the Governor appointed the members of the Detroit Financial Review Team pursuant to that act.[58] But it is equally clear that a financial review team is not a legislative body.

---

[54] For the sake of clarity, we note that in its final order granting declaratory and injunctive relief to Davis, the trial court only held the Detroit Financial Review Team to constitute a public body under the Open Meetings Act. However, McNeil asserted in his complaint that all defendants are public bodies under the Open Meetings Act. Thus, the question of whether the State Treasurer is a public body under the Open Meetings Act is within the scope of issues in controversy in McNeil's case.

[55] *Id.* at 129.

[56] *Id.*, quoting MCL 15.262(a).

[57] MCL 15.262(a); see also *Herald Co*, 463 Mich at 129.

[58] See MCL 141.1512(3).

The Open Meetings Act does not define the term "legislative body." But when a statute does not define words contained within it, we must construe and understand them according to the common and approved usage of the language.[59] And to determine the common, ordinary meaning, courts may consult dictionary definitions.[60] Further, "[t]his Court must avoid a construction that would render any part of a statute surplusage or nugatory," and " '[w]e must consider both the plain meaning of the critical words or phrases as well as their placement and purpose in the statutory scheme.' "[61]

Near the time of the enactment of the Open Meetings Act, the *American Heritage Dictionary of the English Language, New College Edition* defined the word "legislative" as "[h]aving the power to create laws; designed to *legislate*."[62] In turn, that dictionary defined "legislate" as "[t]o pass a law or laws" or "[t]o create or bring about by legislation; enact into law."[63] Similarly, the *Random House Webster's College Dictionary* defines "legislative" as "**1.** having the function of making laws: *a legislative body*. **2.** of or pertaining to the enactment of laws: *legislative proceedings*. **3.** pertaining to a legislature: *a legislative recess*."[64] The same dictionary defines "legislate" as "to make or enact laws."[65] And *A Dictionary of Modern Legal Usage* defines "legislate" as

---

[59] MCL 8.3a.

[60] *People v Peals,* 476 Mich 636, 641; 720 NW2d 196 (2006); *Title Office, Inc v Van Buren Co Treasurer,* 469 Mich 516, 522; 676 NW2d 207 (2004).

[61] *People v Redden,* 290 Mich App 65, 76-77; 799 NW2d 184 (2010) (dealing with initiated laws) (citation omitted; alteration in original).

[62] *American Heritage Dictionary of the English Language, New College Edition* (1978) (emphasis added).

[63] *Id.*

[64] *Random House Webster's College Dictionary* (1997).

[65] *Id.*

"to make laws; . . . to bring (something) into or out of existence by making laws; to (attempt to) bring about or control by legislation."[66]

The emergency financial manager act does not give a financial review team the power to make or enact law, to bring something into or out of existence by making law, or to attempt to bring about or control by legislation. Therefore, a financial review team cannot legislate and it has no legislative functions. And while the emergency financial manager act gives the state financial authority (that is, in the case of a municipal government, the State Treasurer) rulemaking authority,[67] it gives no such authority to a financial review team. Accordingly, we conclude that the Detroit Financial Review Team is not a legislative body.

### 3. THE DETROIT FINANCIAL REVIEW TEAM AS A GOVERNING BODY

The question whether the Detroit Financial Review Team is a "governing body" is more complex. Again, the Open Meetings Act does not define the term "governing body," but, as defendants point out, *The American Heritage Dictionary of the English Language, New College Edition*, defines "govern" as "[t]o make and administer public policy" for a political unit and to "exercise sovereign authority in."[68] Similarly, the first *Random House Webster's College Dictionary* definition for "govern" is "to rule by right of authority, as a sovereign does: *to govern a nation*."[69] *A Dictionary of Modern American Usage*

---

[66] Garner, *A Dictionary of Modern Legal Usage* (2d ed) (New York: Oxford University Press, 1995).

[67] MCL 141.1529.

[68] *American Heritage Dictionary of the English Language, New College Edition* (1978).

[69] *Random House Webster's College Dictionary* (1997).

equates "governing" with regulating and controlling.[70] Further, the Legislature has elsewhere defined "governing body" to mean a body that has some specific authority over a political subdivision: a board of commissioners for a county, a city or village council, a township board, a body with legislative powers, or any body that has general governing or policymaking authority over a political subdivision.[71]

It is also instructive to examine the entire context of the Open Meetings Act to determine the Legislature's intent when it used the term "governing body."[72] Within the definition of "public body" is the added provision that the state or local legislative or governing body must be empowered by state constitution, statute, charter, ordinance, resolution, or rule to "exercise governmental or proprietary authority or perform a governmental or proprietary function[.]"[73] As a consequence, in the case of the provisions of the emergency financial manager act, we must look to the "authority" or "function" that the act empowers a financial review team to exercise or perform. And, as Davis points out, the focus of our inquiry is the "authority *delegated* to [the financial review team], not the authority it *exercised*."[74]

---

[70] Garner, *A Dictionary of Modern American Usage* (New York: Oxford University Press, 1998).

[71] See, for example, MCL 45.582(d); MCL 120.102(c) and (d); MCL 123.731(k); MCL 124.112(b); MCL 124.301(f); MCL 124.531(a); MCL 125.651(d); and MCL 125.1603(c). See *Louis A Demute, Inc v Employment Security Comm*, 339 Mich 713, 721-722; 64 NW2d 545 (1954) (indicating that, although not determinative, the terms of one statute may be taken as a factor in determining the interpretation of another statute).

[72] *Macomb Co Prosecutor v Murphy*, 464 Mich 149, 159; 627 NW2d 247 (2001) ("We construe an act as a whole to harmonize its provisions and carry out the purpose of the Legislature.").

[73] MCL 15.262(a).

[74] *Schmiedicke v Clare Sch Bd*, 228 Mich App 259, 264; 577 NW2d 706 (1998).

Section 12(3)[75] of the emergency financial manager act sets out the process by which the Governor may appoint a financial review team, but it is § 13 of that act that generally delineates a financial review team's authority and functions.[76] Indeed, MCL 141.1513 states unequivocally that

> [t]he review team shall have the full power in its review to perform all of the following *functions*:
>
>    (a) Examine the books and records of the local government.
>
>    (b) Utilize the services of other state agencies and employees.
>
>    (c) Negotiate and sign a consent agreement with the chief administrative officer of the local government. . . . In order for the consent agreement to go into effect, it shall be approved, by resolution, by the governing body of the local government and shall be approved and executed by the state financial authority. . . .
>
>    (2) The review team shall meet with the local government as part of its review. At this meeting, the review team shall receive, discuss, and consider information provided by the local government concerning the financial condition of the local government.
>
>    (3) The review team shall report its findings to the governor, with a copy to the state financial authority . . . .

The report given to the Governor must include "the existence, or an indication of the likely occurrence of," a number of criteria relating to the financial condition of a local government.[77] In its report, a review team must include one of four conclusions concerning the financial condition of the local government.[78] The second per-

---

[75] MCL 141.1512(3).

[76] MCL 141.1513.

[77] MCL 141.1513(3).

[78] MCL 141.1513(4).

missible conclusion is that the local government is "in a
condition of severe financial stress . . . , but a consent
agreement containing a plan to resolve the problem has
been adopted . . . ."[79]

In addition, a financial review team is empowered,
with the approval of the State Treasurer as the state
financial authority, to "appoint an individual or firm to
carry out the review and submit a report to the review
team for approval."[80] And, as Davis and McNeil point
out, a financial review team has the power, under
certain circumstances, to issue subpoenas and adminis-
ter oaths to certain enumerated individuals and enti-
ties.[81] Further, a financial review team, under certain
circumstances, may file an action in a circuit court to
compel testimony and the furnishing of records and
documents.[82]

In arguing that a financial review team is not a
governing body, defendants place considerable empha-
sis on *The American Heritage Dictionary*'s use of the
words "sovereign authority." The Attorney General
couples these words with the definition in *The Ameri-
can Heritage Dictionary of the English Language, New
College Edition* of the word "sovereign" as meaning
"[h]aving supreme rank or power" or "[s]elf-governing;
independent[.]"[83] Accordingly, defendants assert that a
governing body "is a body that makes or administers
public policy for a political unit or exercises supreme or
independent authority."

---

[79]  MCL 141.1513(4)(b).

[80]  MCL 141.1513(5).

[81]  MCL 141.1526(1).

[82]  *Id.*

[83]  *The American Heritage Dictionary of the English Language, New
College Edition* (1978).

To the extent that defendants describe a public body's authority as "supreme," we find that definition to be overstated and therefore, paradoxically, too narrow. In our view, the question is not whether a financial review team exercises "supreme" sovereign authority in the manner of the early English kings or the Russian czars. In Michigan's constitutional democracy with, at the state level, three coequal branches of government exercising checks and balances on one another, together with various local governmental entities exercising various responsibilities, it is the rare individual or entity indeed that exercises "supreme" and unchecked authority. Defendants' definition would winnow the number of public bodies in this state down to a precious few. And we do not believe that the Legislature intended such a constricted definition.

However, we do accept defendants' definition to the extent that a governing body should be one that is "[s]elf-governing; independent";[84] that is, a body that makes or administers public policy for a political unit or exercises independent authority. And concomitant with that independent authority is the power of that governing body to make decisions, which the Open Meetings Act defines as a "determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill or measure . . . by which a public body effectuates or formulates public policy."[85]

Davis and McNeil, on the other hand, appear to argue that we should consider *any* state or local body empowered by law to exercise governmental or proprietary authority or perform a governmental or proprietary function to be a public body under the Open Meetings

---

[84] *The American Heritage Dictionary of the English Language, New College Edition* (1978).

[85] MCL 15.262(d) (emphasis added).

Act. Indeed, Davis asserts that in *Booth Newspapers* the Supreme Court "clarified" that a public body does not have to be a legislative or governing body.

But *Booth Newspapers* actually says no such thing. Rather, *Booth Newspapers* stated that "*a* key determination of the [Open Meetings Act's] applicability is whether the body in question exercises governmental or proprietary authority."[86] The Supreme Court obviously did not read the words "legislative or governing body" out of the Open Meetings Act when it decided *Booth Newspapers*. To do so now would be to render the statutory language nugatory.[87] As previously set forth, § 2(a) of the Open Meetings Act defines a public body in relevant part to be "any state or local legislative or governing body," including certain enumerated examples, that is empowered by various sources of law "to exercise governmental or proprietary authority or perform a governmental or proprietary function[.]"[88]

Treating *any* state or local body that is empowered by law to exercise governmental or proprietary authority or perform a governmental or proprietary function as a public body under the Open Meetings Act would improperly render nugatory the Legislature's use of the adjective "governing" to *limit* the types of bodies that are public bodies subject to the Open Meetings Act. By identifying whether the body in question exercises governmental or proprietary authority as *a* key determination under the Open Meetings Act, the Supreme Court did not say, nor can it reasonably be inferred, that this was the *only*

---

[86] *Booth Newspapers*, 444 Mich at 225 (emphasis added), citing *Goode*, 143 Mich App at 759 ("The dispositive question is whether the performance of necessary governmental functions is open to the public.").

[87] *Apsey v Mem Hosp*, 477 Mich 120, 131; 730 NW2d 695 (2007) ("[A] reviewing court should not interpret a statute in such a manner as to render it nugatory.").

[88] MCL 15.262(a).

determination to be made under the act. As defendants point out, the fact that a body exercises governmental authority is not itself dispositive. The body must also be a legislative or governing body.[89]

This Court's opinion in *Crowley v Governor*[90] makes it clear that not all governmental bodies empowered to exercise a governmental function are public bodies within the meaning of the Open Meetings Act. *Crowley* involved the question whether the Legislative Leadership Committee, which consisted of four leading members of the Legislature, was a public body under the Open Meetings Act and thus had violated the act by convening a special session of the Legislature without complying with the act.[91] This Court agreed with the defendants in *Crowley* that the Legislative Leadership Committee was not a public body because it did not "legislate" or "govern," emphasizing that the authority of the committee "amount[ed] to the sole administrative task of reconvening the Legislature in the case of an emergency."[92] Because the Legislative Leadership Committee was plainly a committee that exercised a governmental function in reconvening the Legislature, it is inherent in the holding in *Crowley* that not *every* governmental committee charged with exercising a governmental function is a public body under the Open Meetings Act.[93]

---

[89] *Herald Co*, 463 Mich App at 132, n 15 (stating that establishing the second requirement—governmental authority—does not establish the first requirement—that the entity is a legislative or governing body).

[90] *Crowley v Governor*, 167 Mich App 539; 423 NW2d 258 (1988).

[91] *Id.* at 541-542.

[92] *Id.* at 545-546.

[93] See also *Herald Co*, 463 Mich at 136 n 19 (concluding that a purely advisory body that did not derive its power from state constitution, statute, charter, ordinance, resolution, or rule was not subject to the Open Meetings Act).

In our view, the question is whether, looking at the four corners of the emergency financial manager act, that act empowers a financial review team (1) as a "governing body" (2) to exercise an independent governmental or proprietary authority or (3) to perform an independent governmental or proprietary function, (4) either one of which results in independent decision-making by which a financial review team effectuates or formulates public policy.

We note that, pointing to the definition of "decision," plaintiffs argue that the financial review team was involved in decision-making by making recommendations. In other words, plaintiffs contend that the act of making a recommendation alone constitutes a decision within the meaning of the Open Meetings Act's definition.[94] However, we find it significant that the definition does not merely refer to a recommendation alone. Rather, it refers to a "determination, action, vote, or disposition *upon* a motion, proposal, recommendation, resolution, order, ordinance, bill or measure"—the operative word here being "upon."

We observe that rarely do recommendations coming from a public body originate from the entire public body itself. As an example, when the State Administrative Board meets to approve contracts, the recommendation for approval comes from a committee of the board, not the board itself. Similarly, when a local city council meets to consider a budget, the recommendation for approval of the budget usually comes from the mayor, not the city council itself. In those circumstances, the public body acts "upon" a recommendation made to it by another entity, group, or person. The public body does not usually initiate or make a recommendation to itself.

---

[94] MCL 15.262(d).

With this distinction in mind, we turn to the "authority" or "function" that the emergency financial manager act empowers a financial review team to exercise or perform. Consequently, we must consider § 13[95] of the emergency financial manager act, within the analytical context of the Open Meetings Act, particularly its definitional sections.[96]

a. EXAMINING THE BOOKS AND RECORDS

A financial review team's first function under § 13 is to examine the books and records of the local government.[97] This function is purely investigative in nature. And investigations do not, when standing alone, involve independent decision-making that effectuates or formulates public policy. These investigations may ultimately lead to recommendations, advice, and perhaps decisions by other entities, groups, or persons. But in no sense are such investigations "governing" by making decisions that effectuate or formulate public policy. Inherently, they do not involve determinations, actions, votes, or dispositions. While they may be governmental or proprietary in nature, their result is purely advisory.[98]

As defendants point out, perhaps the closest analogue to a financial review team under the emergency financial manager act is the Auditor General. The Auditor General and his or her staff has the authority

---

[95] MCL 141.1513.

[96] MCL 15.262.

[97] MCL 141.1513(1)(a).

[98] See *Herald Co*, 463 Mich at 136 n 19 (stating that a city manager's committee's duties—to aid in establishing hiring criteria, soliciting and screening applicants, interviewing applicants, and to advise on the selection of the most qualified candidate—were "purely advisory in nature"); *House Speaker v Governor*, 443 Mich 560, 594 n 40; 506 NW2d 190 (1993) (stating that the Open Meetings Act does not apply to advisory boards created by executive order to advise governmental departments).

to examine "the books, accounts, documents, records, performance activities, and financial affairs of each branch, department, office, board, commission, agency, authority, and institution of this state."[99] In doing so, individuals are required to cooperate with the audit and answer truthfully all questions related to the audit.[100] And the Auditor General and his or her appointees have the power to issues subpoenas, compel the attendance and testimony of witnesses, and administer oaths.[101] However, we have found no case in Michigan in which the Auditor General and his or her audit team has been held to be a public body.

### b. UTILIZING THE SERVICES OF OTHER STATE AGENCIES AND EMPLOYEES

A financial review team is also empowered under § 13 to utilize the services of other state agencies and employees.[102] While this language rather clearly establishes that a financial review team is a state agency, this function is otherwise administrative in nature and therefore uninformative. Again, while such utilization may be governmental or proprietary in nature, it does not involve "governing" by the financial review team through independent determinations, actions, votes, or dispositions that effectuate or formulate public policy.

### c. NEGOTIATING AND SIGNING A CONSENT AGREEMENT

It is a financial review team's third function under § 13—the power to negotiate and sign a consent agreement with the chief administrative officer of the local

---

[99] MCL 13.101(2).

[100] MCL 13.101(3).

[101] MCL 13.101(4).

[102] MCL 141.1513(1)(b).

government[103]—that is the fulcrum of this case. These actions might *appear* to be an act of "governing" by both formulating—through negotiations with the local government—and effectuating—through signing the consent agreement—public policy. However, language in the remainder of that subdivision invalidates such a conclusion. That language states that "[i]n order for the consent agreement to go into *effect*, it shall be approved, by resolution, by the governing body of the local government and shall be approved and executed by the state financial authority,"[104] here, the State Treasurer.

As a result, when we consider the entirety of this critical subdivision of the emergency financial manger act, we conclude that a consent agreement that a financial review team negotiates and signs is but the first step in the process of effectuating or formulating public policy. A financial review team is not acting "upon" a "motion, proposal, recommendation, resolution, order, ordinance, bill or measure" that has come before it.[105] Rather, it is *making* a recommendation "upon" which the governing body of the local government and the State Treasurer, acting as the state financial authority can, within the exercise of their full discretion, act.

Such a consent agreement is, until the governing body of the local government approves it and the State Treasurer approves and executes it, only a recommendation. And, in our view, a recommendation for action by *another* entity, group, or individual, by its very nature, cannot constitute "governing" either through the effectuating or the formulating of public policy by the entity that is itself making the recommendation.

---

[103] MCL 141.1513(1)(c).

[104] *Id.* (emphasis added).

[105] MCL 15.262(d).

That is, even by negotiating and signing the consent agreement, the financial review team is not, and cannot be, by statute, exercising independent authority to effectuate the recommendation contained in the consent agreement.

Therefore, under the process established by the emergency financial manager act, a financial review team can only, together with the chief administrative officer of a local government, provide a *recommended* consent agreement to the governing body of the local government and the State Treasurer. The financial review team itself has no capacity to act upon this recommendation and has no power to implement it. The effectuating and formulating of public policy can only occur by and through the actions of the governing body of the local government and the State Treasurer. They, and only they, can act upon the recommended consent agreement after the financial review team forwards that recommended consent agreement for approval.

This differs critically from the acts of individual or subquorum groups of regents in *Booth Newspapers*. In that case, the individual regents or subquorum groups were not merely making recommendations. Rather, they were effectively exercising the authority of the University of Michigan Board of Regents to narrow the field of candidates and ultimately choose the person to be the university president. In contrast, a financial review team cannot exercise authority to *adopt* a consent agreement but can merely participate in preparing a *recommended* consent agreement. And, in our view, the preparation of a recommended consent agreement cannot constitute "governing" either through the effectuating or the formulating of public policy.[106]

---

[106] See *Herald Co*, 463 Mich at 136 n 19; *Booth Newspapers*, 444 Mich at 240 n 8 (BOYLE, J., concurring in part and dissenting in part).

Until approved by the governing body of the local government (presumably in accordance with the Open Meetings Act), a financial review team's *recommended* consent agreement does not and cannot "govern" the actions of such a local government. And, even then, until approved and executed by the State Treasurer, it does not and cannot "govern" the actions of state government. Stated another way, until properly acted "upon"—not by the financial review team, but by the governing body of the local government and by the State Treasurer—a consent agreement that a financial review team negotiates and signs is not a contract and has no legal effect.[107]

And, as defendants point out, the functions that the emergency financial manager act empowers a financial review team to undertake do not include public policy-making with respect to a local governmental unit. While a financial review team performs its functions, local officials still govern the local governmental unit. The emergency financial manager act does not suspend or alter the authority of these officials until the Governor puts the local governmental unit into receivership and appoints an emergency financial manager.[108] At that point, an emergency financial manager, not the financial review team, assumes the powers of the local governmental unit. Thus, a financial review team has no authority under the emergency financial manager act to "govern" any local governmental unit by effectuating or formulating public policy.

We conclude therefore that the process by which a financial review team negotiates and signs a consent agreement is not "governing" through independent

---

[107] See *Minock v Shortridge*, 21 Mich 304, 315 (1870) (stating that an executory contract "has no binding force until it is confirmed").

[108] MCL 141.1519(2).

decision-making that effectuates or formulates public policy. The financial review team's actions in negotiating and signing a consent agreement are not a "decision" within the meaning of the Open Meetings Act because the financial review team is not acting upon a recommendation. Rather, it is *making* a recommendation.

We further recognize that the rather intricate workings of the emergency financial manager act create a situation whereby a financial review team's decision *not* to negotiate and sign a consent agreement might be considered a "determination, action, vote, or disposition,"[109] albeit a negative one. Following a financial review team's decision not to negotiate and sign a consent agreement, the local governing body and the State Treasurer would not thereafter be able to approve and execute a consent agreement.

Rather clearly, however, the Legislature anticipated such a circumstance. Under § 15(1)[110] of the emergency financial manager act, the Governor, after receiving the required report from the financial review team under § 13(3),[111] would be required to determine either that "[t]he local government is not in a condition of severe financial stress"[112] or that "[a] local government financial emergency exists . . . and no satisfactory plan exists to resolve the emergency."[113]

Therefore, a financial review team's decision not to negotiate and sign a consent agreement would eliminate one option—the approval and execution of a consent agreement—but that decision would leave at least

---

[109] See MCL 15.262(d).

[110] MCL 141.1515(1).

[111] MCL 141.1513(3).

[112] MCL 141.1515(1)(a).

[113] MCL 141.1515(1)(c).

two options open for the Governor. Thus, that decision still effectively functions as a recommendation "upon" which the Governor can act by selecting one of the remaining alternatives. In effectively recommending, but not itself acting "upon" the selection of one of these remaining alternatives, a financial review team is not itself "governing" as it is neither effectuating nor formulating public policy.

More broadly, a refusal to negotiate and sign a consent agreement is not an affirmative act of "governing." Rather, it is a *refusal* to govern, a negative act. Logically speaking, therefore, a financial review team could not be a "governing body" if it, in fact, refused to govern.

### d. MEETING WITH THE LOCAL GOVERNMENT

A financial review team's fourth function under § 13 is to meet with the local government and receive, discuss, and consider information provided by the local government concerning the financial condition of the local government.[114] Again, this function is investigative in nature and is not "governing" through independent decision-making that effectuates or formulates public policy.

### e. REPORTING ITS FINDINGS TO THE GOVERNOR

A financial review team's fifth function under § 13 is to report its findings to the Governor, with a copy to the State Treasurer acting as the state financial authority.[115] The report, even if it contains recommendations in addition to "findings," is purely advisory in nature

---

[114] MCL 141.1513(2).
[115] MCL 141.1513(3).

and cannot constitute "governing" through independent decision-making that effectuates or formulates public policy.

Again, the financial review team is not acting on these advisory recommendations as it has no power to do so. Rather, the financial review team is *making* recommendations on which others may, at their discretion, act. And a financial review team has no discretion in the matter. Section 13(3) of the emergency financial manager act states that a financial review team "*shall* report its findings to the governor" and that the findings "*shall* include the existence, or an indication of the likely occurrence," of any of a delineated set of financial conditions.[116]

### f. CONCLUSION

We therefore conclude that the authority and functions of a financial review team under § 13 of the emergency financial manager act[117] do not empower a financial review team to independently govern through decision-making that effectuates or formulates public policy. A financial review team cannot act on its recommendations; it can only *make* such recommendations. As a consequence, we conclude that the Detroit Financial Review Team is not a "governing body" and, therefore, not a "public body" within the meaning of the Open Meetings Act.[118]

The fact that a financial review team can hire outside experts,[119] has the power, under certain circumstances, to issue subpoenas and administer oaths to certain

---

[116] MCL 141.1513(3) (emphasis added).

[117] MCL 141.1513.

[118] MCL 15.262(a).

[119] MCL 141.1513(5).

enumerated individuals and entities,[120] and can, under certain circumstances, file an action in a circuit court to compel testimony and the furnishing of records and documents[121] does not change our conclusion. These functions are ancillary to the financial review team's investigative function. Again, such functions are not "governing" because they do not involve independent decision-making that effectuates or formulates public policy.

In light of our conclusion that a financial review team is not itself a public body, we conclude that the Supreme Court's holding in *Booth Newspapers* is inapplicable here. That is, since the Detroit Financial Review Team is not itself a public body, then the State Treasurer could not himself, even if acting as a "one man committee," be a public body exercising governmental authority.

#### 4. DELEGATION BY A PUBLIC BODY

Additionally, we note that the fact that the Governor—who is clearly not a public body—appoints the financial review team, takes this case out of the realm of cases like *Morrison v East Lansing*,[122] in which this Court held that an advisory committee appointed by the city council was a public body subject to the Open Meetings Act. The East Lansing City Council had created the Hannah Building Committee by resolution to serve as "an advisory committee to assist in the selection of architects, designers, and professional service organizations and to advise the council on programmatic needs and other issues to be decided in the

---

[120] MCL 141.1526(1).

[121] *Id.*

[122] *Morrison v East Lansing*, 255 Mich App 505, 520; 660 NW2d 395 (2003).

planning process" for a community-center project.[123] This Court considered the question whether the Hannah Building Committee was a public body under the Open Meetings Act to be a "close call."[124]

But, ultimately this Court in *Morrison* concluded that the Hannah Building Committee was a public body under the Open Meetings Act, emphasizing that, unlike the advisory committee to the city manager in *Herald Co*, the Hannah Building Committee was created by the East Lansing City Council—a public body under the Open Meetings Act as a local legislative body—and that the city council "effectively authorized the [Hannah Building Committee] to perform a governmental function."[125] This Court considered the situation in *Morrison* to be more akin to the holding in *Booth Newspapers* that various bodies created by the University of Michigan Board of Regents to which the board of regents delegated authority constituted public bodies, as compared to the holding in *Herald Co* that an advisory committee to a city manager did not constitute a public body.[126]

We recognize that, under *Morrison*, an advisory committee to a public body *that is created by that public body* may itself constitute a derivative public body. But the question of a financial review team under the emergency financial manager act differs markedly from the committee at issue in *Morrison*. Unlike the Hannah Building Committee, a financial review team is not created *by* a public body to serve in an advisory role *to* a public body. Rather, as discussed previously, the emergency financial manager act provides a method for the

[123] *Id.* at 507-508.

[124] *Id.* at 520.

[125] *Id.*

[126] *Id.* at 518-520.

Governor—who, again, is clearly not a public body—to appoint a financial review team.[127] We conclude that the holding in *Morrison*, which is rooted in the Supreme Court's earlier holding in *Booth Newspapers*, is inapplicable to a financial review team. The Governor's appointment pursuant to statute creates a financial review team. Such a financial review team is thus not created by a public body to serve it in an adjunct advisory role.

### III. INJUNCTIVE RELIEF

#### A. OVERVIEW

We have explained our conclusion that a financial review team under the emergency financial manager act is not a "governing body" as the Open Meetings Act defines that term and, consequently, is not a "public body" subject to that act. The trial court in these consolidated appeals issued various forms of injunctive relief primarily based upon its contrary conclusion that the Detroit Financial Review Team *is* a "public body." In examining the analysis in which the trial court engaged to reach that contrary conclusion, we find that analysis to have been, at best, superficial.

The trial court appeared to be concerned mainly with its own view that, in the general scheme of things, the Open Meetings Act *ought to* cover the Detroit Financial Review Team, not whether a close reading of the text of the Open Meetings Act actually warranted a conclusion that it *does* cover the Detroit Financial Review Team. In short, the trial court concentrated on what the law *should* be, not what the law *is*. More specifically, while the trial court did appear to recognize, at least superficially, the traditional standards for injunctive relief, it essentially

---

[127] MCL 141.1512(3).

leapfrogged to the conclusion that the Detroit Financial Review Team was a public body and therefore that there was a substantial likelihood that Davis and McNeil would prevail on the merits of their claims. In our analysis, we have reached the exact opposite conclusion. In our view, such public policy matters are for the Legislature, and not this Court, to decide.[128]

The trial court further found that there would be irreparable harm to the public if it did not issue injunctive relief, apparently without considering whether the declarative relief contained in its various rulings and orders was sufficient under the circumstances then prevailing and under applicable precedent of this Court and the Supreme Court. We therefore conclude that the trial court's issuance of injunctive relief was contrary to controlling principles of law and an abuse of discretion.

### B. STANDARD OF REVIEW

The grant or denial of a preliminary injunction is within the sound discretion of the trial court, and this Court will not reverse that decision absent an abuse of that discretion.[129] An abuse of discretion exists when the decision is outside the range of principled outcomes.[130] The exercise of this discretion may not be arbitrary, but rather must be in accordance with the fixed principles of equity jurisdiction and the evidence in the case.[131] An abuse of discretion may arise from the

---

[128] *Tyler*, 459 Mich at 393 n 10.

[129] *Mich Coalition of State Employee Unions v Civil Serv Comm*, 465 Mich 212, 217; 634 NW2d 692 (2001).

[130] *Detroit Fire Fighters Ass'n, IAFF Local 344 v Detroit*, 482 Mich 18, 28; 753 NW2d 579 (2008).

[131] *Jeffrey v Clinton Twp*, 195 Mich App 260, 263; 489 NW2d 211 (1992).

court's misunderstanding of controlling legal principles.[132] A question of statutory interpretation is a question of law that we review de novo.[133] We review the facts on which the court relies in exercising its discretion for clear error.[134]

### C. LEGAL STANDARDS

As this Court has recognized, "[a]n injunction represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity."[135] This Court has identified four factors to consider in determining whether to grant a preliminary injunction:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued.[136]

Stated another way, injunctive relief " ' "is an extraor-

[132] *East Lansing v Dep't of State Police*, 269 Mich App 333, 335; 712 NW2d 519 (2005).

[133] *Costa v Community Emergency Med Servs, Inc*, 475 Mich 403, 408; 716 NW2d 236 (2006).

[134] *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America, UAW v Michigan*, 231 Mich App 549, 551; 587 NW2d 821 (1998).

[135] *Senior Accountants, Analysts & Appraisers' Ass'n v Detroit*, 218 Mich App 263, 269; 553 NW2d 679 (1996).

[136] *Alliance for the Mentally Ill of Mich v Dep't of Community Health*, 231 Mich App 647, 660-661; 588 NW2d 133 (1998); see also *Mich State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 157-158; 365 NW2d 93 (1984), and *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 10-11; 753 NW2d 595 (2008) (discussing the irreparable harm portion of the analysis).

dinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury." ' "[137]

Further, with respect to irreparable harm, we

> note that the Supreme Court has recently recognized that declaratory relief normally will suffice to induce the legislative and executive branches, the principal members of which have taken oaths of fealty to the constitution identical to that taken by the judiciary, Const 1963, art 11, § 1, to conform their actions to constitutional requirements or confine them within constitutional limits. Only when declaratory relief has failed should the courts even begin to consider additional forms of relief in these situations.[138]

### D. LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1. DOCKET NO. 309218

As previously noted, on February 1, 2012, Davis filed his action in the Ingham Circuit Court seeking both declaratory and injunctive relief based upon his assertions that the Detroit Financial Review Team, the Governor, and the State Treasurer had violated multiple provisions of the Open Meetings Act. On February 6, 2012, the trial court issued its order in this case granting a preliminary injunction and denying defendants' motion for stay. The trial court granted the preliminary injunction against the Detroit Financial Review Team "for the reasons stated from the bench and incorporated herein" and denied defendants' motion for stay on the same basis. The trial court made no mention of the standards for injunctive relief in this order.

---

[137] *Pontiac Fire Fighters Union*, 482 Mich at 8, quoting *Kernen v Homestead Dev Co*, 232 Mich App 503, 509; 591 NW2d 369 (1998), quoting *Jeffrey*, 195 Mich App at 263-264.

[138] *Straus v Governor*, 459 Mich 526, 532; 592 NW2d 53 (1999) (quotation marks and citations omitted).

And on February 29, 2012, the trial court granted Davis's motion for a declaratory judgment, denied defendants' motion for summary disposition, and granted Davis's motion for a permanent injunction "for the reasons stated from the bench on February 6 and 15, 2012 and incorporated herein." Once again, the trial court made no mention of the standards for injunctive relief in this order.

We observe that the trial court's orders depend on the rationale that the trial court advanced in its rulings from the bench on February 6 and February 15, 2012. While the February 15 ruling made no reference to the likelihood that Davis would prevail on the merits—a critical element in determining whether to issue an injunction—the trial court did shed some light on the reasoning behind its determination that the Detroit Financial Review Team was subject to the Open Meetings Act. In particular, the trial court mentioned that a financial review team had the "power to enter into a contract," as well as the power to subpoena witnesses and the power to go to court to compel the production of documents.

In its ruling from the bench on February 6, the trial court articulated much the same rationale. After generally commenting on cases that the trial court had presided over involving advisory committees, the trial court stated that, "[v]ery importantly, [financial review teams] can negotiate and sign . . . a consent agreement with the chief administrative office of the local government." The trial court also mentioned that a financial review team has the right to examine books and records, the right to use other state agencies, the power to issue subpoenas, and the power to apply to courts to require persons to furnish answers to questions under oath. The trial court concluded, "This certainly goes far

beyond what an advisory committee, in my opinion
based upon what I've seen, would do."

It is therefore clear that the trial court did in these
two rulings from the bench give some indication that it
had examined the functions of a financial review team
under the emergency financial manager act. However,
the trial court, in its various rulings and orders, never
mentioned the requirements of the Open Meetings Act
and the cases interpreting it.

Accordingly, the trial court gave no indication—other
than to say that its enumeration of a financial review
team's functions went "far beyond" those of an advisory
committee—whether it considered a financial review
team to be either a "legislative body" or a "governing
body" as the Open Meetings Act uses those terms.[139]
Nor did the trial court state that a financial review team
was empowered to exercise governmental or propri-
etary authority or to perform a governmental or propri-
ety function.[140] And the trial court entirely failed to
consider whether a financial review team could engage
in decision-making that effectuates or formulates public
policy.[141] Thus, the trial court's analysis was contrary to
controlling legal principles.

This lack of an Open Meetings Act analytical frame-
work is best illustrated by the trial court's handling of
a review team's power to negotiate and sign a consent
agreement.[142] As we have already outlined, this power is
at the very center of this case, and we agree with the
trial court that it is therefore important. The trial court
necessarily had to conclude, although it did not articu-

---

[139] See MCL 15.262(a).

[140] *Id.*

[141] *Id.*

[142] MCL 141.1513(1)(c).

late this conclusion, that this power involves the authority to make a "decision" under the Open Meetings Act.

But a financial review team does not have such authority. As we have said, a consent agreement that a financial review team negotiates and signs is but the first step in the process of effectuating or formulating public policy. It is, until the governing body of the local government approves it and the State Treasurer approves and executes it, only a recommendation. And making a recommendation does not constitute "governing" either through the effectuating or the formulating of public policy. As we have outlined, a review team is not acting upon a recommendation when it negotiates and signs a consent agreement. Rather, it is *making* such a recommendation to the local governing body and to the State Treasurer.

In this respect, as well as with respect to the other powers of a financial review team that the trial court enumerated—all of which, in our view, are in furtherance of a financial review team's investigative function and do not constitute governing—the trial court's conclusion that Davis would prevail on the merits was contrary to controlling legal principles. Consequently, there was no likelihood, much less a substantial likelihood, that Davis would prevail on the merits. We conclude that to the extent that the trial court issued declaratory and injunctive relief in Docket No. 309218, that relief was unwarranted and inappropriate.

### 2. DOCKET NO. 309250

As described earlier in this opinion, the trial court held a hearing on defendant's motions at issue in Docket No. 309250 on March 20, 2012. At the hearing,

the trial court commented on Davis's representations that defendants continued to violate the Open Meetings Act, stating:

> And that was, of course, what I viewed to be a very potential and serious effort to undermine my ruling by appointing a subcommittee of members of this board to do the exact job that the board was supposed to do and then report back to the board, which if anyone had followed the Supreme Court rulings on these points it would have been clear that that would be, if true, a violation of the act.
>
> So now I understand, and maybe I'm all wrong, but what I've picked up from the papers is that now has been discarded and they are not doing any subcommittee, and Mr. Dillon himself, who is the chair of this committee, is going around creating his own plan or having someone under his control create his own plan, submit that to the City of Detroit, submit it to various people without anybody knowing what is going on.
>
> And then Dave Bing—I read the paper. I get the Detroit News. I get the Detroit News/Free Press combo, and I get all these editorials on both sides of things. But the reality is, is that none of us have been told anything. I issued an order that they have to meet properly under the Open Meetings Act. And I am very concerned and uncomfortable with the concept of creating your own plan and submitting it to someone for their approval without having an open meeting and a fair, frank discussion under the Open Meetings Act policy of these things.

The trial court went on to comment:

> I am happy to have anybody appeal. But my orders are in place until the court of appeals overturns them. And if anybody says that the Open Meetings Act doesn't apply here it certainly won't be the court of appeals.

The trial court concluded by stating:

> All I said was, all I said was is there can be no agreement executed with the City of Detroit under this plan until such

time as I see that the act has been complied with in an open and fair and frank manner. And that may well happen in minutes and they'll explain it to us and we'll all go home happy. I'll sign an order to that effect . . . .

After the hearing, the trial court issued its March 20, 2012, order. In that order, the trial court adjourned the show-cause hearing to March 29, 2012, and ordered defendants' counsel to produce five members of the Detroit Financial Review Team to provide testimony at the show-cause hearing. The trial court further ordered the Detroit Financial Review Team and the State Treasurer not to execute or sign a consent agreement or its equivalent with the City of Detroit, the Detroit City Council, or the Mayor of Detroit until further order of the trial court.

We presume, from the context of this case, that the trial court relied on its previous finding that Davis was likely to prevail on the merits as one of the underlying reasons for issuing its March 20, 2012, order, although that is not clear from the record. While the trial court did, for the first time, make some brief references to the provisions of the Open Meetings Act, its ruling from the bench and its subsequent order simply contain no analysis of the functions of a financial review team through the lens of the requirements of that act.

Accordingly, we conclude that the trial court's analysis was contrary to controlling legal principles. And, thus, there was no basis for the trial court to conclude that Davis was likely to prevail on the merits.

### 3. DOCKET NO. 309482

After McNeil filed his complaint on March 29, 2012, the trial court, without hearing from defendants, on March 30, 2012, issued a temporary restraining order and order to show cause that, among other things,

found that McNeil was likely to succeed on the merits of his claims because the defendants "have issued at least one decision, on March 26, 2012, which was done based upon deliberations and/or decisions which took place in private." The trial court further found that McNeil was likely to succeed on the merits of his claim that defendants had violated the Open Meetings Act "by engaging in discussions and deliberations concerning the negotiations or execution of a consent agreement and/or similar document (i.e., financial stability agreement), as such discussions and deliberations were not in public."

In that order, the trial court was making distinctly factual findings. Presumably, these findings were based on McNeil's complaint because there was no other record before the trial court at the time of its order. Indeed, the trial court apparently issued its order without hearing from defendants, which is of itself distressing given the accessibility of defendants' attorneys in the Lansing area. We decline to review these factual findings because they are irrelevant in light of our conclusion that the State Treasurer and the Detroit Financial Review Team are not public bodies under the Open Meetings Act. Therefore, the trial court's finding that McNeil was likely to succeed on the merits is contrary to controlling legal principles.

### E. IRREPARABLE HARM

The trial court twice referred to the irreparable-harm standard in its various rulings and orders in these consolidated appeals. The first reference was contained in its ruling concerning the preliminary injunction on February 6, 2012, when it stated:

> But I do think that when you have a statute that requires open meetings and where the agency on its own authority is refusing to comply or that board is not com-

plying with the requirements under that statute, *that that is, per se, irreparable harm to the people of this state who have a right, who have a right to know what their boards and commissions who have this kind of power are actually doing*.[143]

The second reference was in the trial court's order of March 30, 2012, concerning McNeil's request for a temporary restraining order, in which the trial court stated:

It is further ordered that [McNeil] may be entitled to [the injunctive relief described in the preceding paragraph of the order] *in order to prevent irreparable harm,* because [McNeil] will suffer more harm without an injunction than the Defendants will with an injunction, and the public interest weighs in favor of the issuance of the injunction.[144]

Thus, the trial court was aware of the requirement for a showing of irreparable harm before the issuance of injunctive relief. Further, the idea that there is *per se* irreparable harm to the public when a violation of the Open Meetings Act occurs has some support in caselaw.[145] But caselaw also recognizes that when the record fails to indicate that a public body has acted in bad faith, there is no real and imminent danger of irreparable injury requiring issuance of an injunction.[146]

In this case, in its February 15, 2012, ruling from the bench concerning Davis's motion for a declaratory

---

[143] Emphasis added.

[144] Emphasis added.

[145] See, for example, *The Detroit News, Inc v Detroit*, 185 Mich App 296, 301; 460 NW2d 312 (1990) ("We believe it is implicit in the purpose of 'sunshine laws' such as the [Open Meetings Act] that there is real and imminent danger of irreparable injury when governmental bodies act in secret.").

[146] See *Esperance v Chesterfield Twp*, 89 Mich App 456, 464-465; 280 NW2d 559 (1979), citing *Wexford Co Prosecutor v Pranger*, 83 Mich App 197, 205; 268 NW2d 344 (1978).

judgment, the trial court clearly found that there was no bad faith on the part of defendants. The trial court stated, "There is no question in my mind that none of these people had any bad motives. No one had any ulterior motives. They simply were following what they believe the statute gave them the powers to do." And in its February 6, 2012, ruling from the bench in the same case, the trial court stated, "I don't think there is any allegation that our Governor or Mr. Dillon did anything wrong other than meet under this statute that they were required to by the legislature." With such findings concerning the lack of bad faith in the record, there was no basis for the trial court's conclusion that there was *per se* irreparable harm to the people.

Our conclusion here is further supported by *Nicholas v Meridian Charter Township Board*,[147] in which the Court noted that, "[m]erely because a violation of the [Open Meetings Act] has occurred does not automatically mean that an injunction must issue restraining the public body from using the violative procedure in the future." And, as previously noted, this Court in *Straus* stated that declaratory relief should be considered first and will suffice in most cases involving the legislative and executive branches.[148]

Thus, we conclude that the trial court's issuance of injunctive relief in Davis's case on the basis of a finding of irreparable harm was an abuse of discretion. The trial court explicitly found that there was no bad faith on the part of defendants. And there had been no

---

[147] *Nichols v Meridian Charter Twp Bd*, 239 Mich App 525, 533-534; 609 NW2d 574 (2000). See also MCL 15.270(2) ("A decision made by a public body *may* be invalidated if the public body has not complied with the [Open Meetings Act] requirements . . . in making the decision . . . *and* the court finds that the noncompliance or failure has impaired the rights of the public under [the Open Meetings Act].") (emphasis added).

[148] *Straus*, 459 Mich at 532.

showing that declaratory relief had failed. Rather, the trial court's February 29, 2012, order contained declaratory relief that obviated any need for injunctive relief at that time.

We are, of course, cognizant of the fact that, after the trial court made its decisions on the merits of Davis's Open Meetings Act claim, Davis sought civil contempt relief against the State Treasurer and the Detroit Financial Review Team. However, Davis's allegation of contemptuous conduct was made *after* the trial court had issued its injunctive orders on February 6 and February 29, 2012. Rather obviously, events occurring subsequent to the grant of injunctive relief cannot retroactively justify the grant of such relief. But equally obviously, parties to litigation must follow rulings and orders of a trial court acting within its jurisdiction unless and until those rulings and orders are stayed or reversed. It is well established that a person may not disregard a court order simply on the basis of a subjective view that the order is wrong or will be declared invalid on appeal.[149] We therefore turn to the question of possible contempt of court in Docket No. 309250.

### IV. CONTEMPT OF COURT

We review for an abuse of discretion a trial court's issuance of a contempt order, but we review for clear error its underlying factual findings, and we review de novo questions of law.[150] As Davis points out, a trial court has the inherent and statutory authority to enforce its orders.[151] Further, "[a] party must obey an order entered by a court with proper jurisdiction, even

---

[149] *Porter v Porter*, 285 Mich App 450, 465; 776 NW2d 377 (2009).

[150] *Id.* at 454-455.

[151] See MCL 600.611; MCL 600.1715.

if the order is clearly incorrect, or the party must face the risk of being held in contempt and possibly being ordered to comply with the order at a later date."[152] And the validity of an order is determined by the courts, not the parties.[153]

In his motion for civil contempt, Davis alleged that the Detroit Financial Review Team, including the State Treasurer, voted by resolution at a public meeting to create a five-member subcommittee and to delegate to that subcommittee authority to consider the risks and benefits of appointment of an emergency manager or institution of a consent agreement as well as to utilize staff of the Department of Treasury, conduct interviews, and hire professional consultants if necessary and that this subcommittee convened in private, with Davis being denied entry to the subcommittee meeting. Davis supported these allegations with affidavits from himself and another person.

We have determined that the Detroit Financial Review Team was not a public body and that the trial court abused its discretion by issuing injunctive relief. Therefore, we have determined that various rulings and orders of the trial court in these consolidated appeals were incorrect. But, of course, that is immaterial to the fact that defendants were obligated to obey those orders while they were in effect. And we cannot conclude that the trial court abused its discretion by scheduling a show-cause hearing based upon Davis's motion for civil contempt.

---

[152] *Kirby v Mich High Sch Athletic Ass'n*, 459 Mich 23, 40; 585 NW2d 290 (1998), citing *In re Hague*, 412 Mich 532, 544-545; 315 NW2d 524 (1982).

[153] *State Bar of Mich v Cramer*, 399 Mich 116, 125-126; 249 NW2d 1 (1976), overruled on other grounds by *Dressel v Ameribank*, 468 Mich 557, 562 (2003).

Before an order to show cause why a party should not be held in contempt may issue, "there must be 'a sufficient foundation of competent evidence, and legitimate inferences therefrom.' "[154] But a finding of willful disobedience of a court order is *not* necessary for a finding of civil contempt.[155] According to Davis's affidavits in support of the motion for civil contempt, the Detroit Financial Review Team allegedly voted to delegate substantial portions of its duties to a five-member subcommittee that allegedly met in private despite the trial court's holding that the Detroit Financial Review Team is a public body subject to the Open Meetings Act.

It is well established in Michigan caselaw, particularly by the Supreme Court's opinion in *Booth Newspapers* and this Court's opinion in *Morrison*, that a public body cannot evade its duty to comply with the Open Meetings Act by delegating its powers to a subcommittee.[156] Thus, we conclude that Davis's allegations about the Detroit Financial Review Team forming a subcommittee to which it delegated substantial portions of its duties and which met in private, provided a sufficient foundation for the trial court to order a show-cause hearing on Davis's motion for civil contempt.

We emphasize that our holding that a review team is not actually a public body subject to the Open Meetings Act is immaterial to this conclusion. Again, a party may not disregard a court order on the basis of a subjective view that the order is wrong or will be declared invalid

[154] *In re Contempt of Steingold (In re Smith)*, 244 Mich App 153, 158; 624 NW2d 504 (2000), quoting *In re Contempt of Calcutt*, 184 Mich App 749, 757; 458 NW2d 919 (1990).

[155] *In re Contempt of United Stationers Supply Co*, 239 Mich App 496, 501; 608 NW2d 105 (2000).

[156] See *Booth Newspapers*, 444 Mich at 225-226; *Morrison*, 255 Mich App at 519-520.

on appeal.[157] Rather, " '[a] party must obey an order entered by a court with proper jurisdiction, even if the order is clearly incorrect . . . .' "[158] Thus, despite our conclusion that a review team is not subject to the Open Meetings Act, the Detroit Financial Review Team was required to obey the trial court's orders requiring it to adhere to the Open Meetings Act as long as those orders remained in effect and had not been stayed or reversed on appeal.

Accordingly, we remand *Davis v Detroit Financial Review Team* (Docket No. 309250) to the trial court for further appropriate proceedings regarding Davis's motion for civil contempt. We note that, generally, coercion to force compliance with a court order and compensatory relief for a complainant are both appropriate potential sanctions for civil contempt.[159] But in light of our holding that the Open Meetings Act does not apply to a review team, it is no longer appropriate for the trial court to seek to compel the Detroit Financial Review Team to comply with the Open Meetings Act, and such an action by the trial court is not within the scope of our remand.

Nevertheless, Davis could potentially be entitled to a civil contempt sanction in the form of a compensatory award of attorney fees, other costs, or both that he incurred on the basis of any proven civil contempt by the Detroit Financial Review Team, the State Treasurer, or both. For example, Davis may be entitled to an award for attorney fees incurred in bringing his motion for civil contempt relief in the event that he proves such civil contempt.

---

[157] *Porter*, 285 Mich App at 465.

[158] *In re Contempt of Dudzinski*, 257 Mich App 96, 110; 667 NW2d 68 (2003), quoting *Kirby*, 459 Mich at 40.

[159] *Contempt of United Stationers*, 239 Mich App at 499.

V. CONCLUSION

We hold that a financial review team, and therefore the Detroit Financial Review Team, is not a "governing body" and therefore is not a "public body" under the Open Meetings Act and is not statutorily required to comply with the Open Meetings Act. We also conclude that the State Treasurer, whether acting in his executive capacity or as a "one man committee" of the Detroit Financial Review Team, is not a "public body."

We further conclude that the trial court's various rulings and orders in these consolidated appeals on their face constituted injunctive relief, and we hold that the trial court abused its discretion when it issued such injunctive relief. We therefore reverse and vacate these rulings and orders in their entirety. Accordingly, with regard to Docket Nos. 309218 and 309482, we remand to the trial court for entry of judgment in favor of defendants on the merits of the Open Meetings Act claims brought by Davis and McNeil, respectively. However, in Docket No. 309250, we remand for an evidentiary hearing on Davis's allegations that various state officials and members of the Detroit Financial Review Team were in contempt of court.

No costs, a public question being involved. Pursuant to MCR 7.215(F)(2), this opinion shall be given immediate effect. We do not retain jurisdiction.

M. J. KELLY, J., concurred with WHITBECK, P.J.

O'CONNELL, J. (*concurring in part and dissenting in part*). I concur with the majority opinion that the City of Detroit Financial Review Team is not subject to the Open Meetings Act (OMA), MCL 15.261 *et seq.* I also concur that the Governor and the State Treasurer, being individual executive branch officeholders, are not

subject to the strictures of the OMA in these cases.[1] I part ways with the majority opinion in its discussion of injunctive and declaratory relief. I write separately to emphasize that an injunction against a coequal branch of government should be an extremely rare remedy, available only after a party has definitively established that a declaratory judgment has been ineffective.

I also write separately to remind all public servants that our governmental system turns on a respectful balance of power among the three branches of government. As Thomas Jefferson aptly explained, "the constitution, in keeping three departments distinct and independent, restrains the authority of the judges to judiciary organs, as it does the executive and legislative to executive and legislative organs." Ford, ed, Letter from Thomas Jefferson to William Charles Jarvis (September 28, 1820), in *The Writings of Thomas Jefferson*, (New York: G. P. Putnam's Sons, The Knickerbocker Press, 1899), vol X, p 161. The judicial branch's responsibility is to interpret the law impartially, free from the political process reserved for the other two branches of government. In my view, these tenets preclude any remand in this case. I would reverse all of the trial court's rulings.[2]

---

[1] In my opinion, neither the Governor nor the State Treasurer acting in the scope of official duties is subject to the OMA, even if acting as a one-person subcommittee of a public body that is subject to the OMA.

[2] These cases involve the relationship between the OMA and the Local Government and School District Fiscal Accountability Act, MCL 141.1501 *et seq.*, commonly known as the emergency financial manager act. The central issue presented to us in these cases is whether a review team that the Governor appoints under § 12(3) of the emergency financial manager act, MCL 141.1512(3), is a "public body," as defined in § 2(a) of the OMA, MCL 15.262(a). The entire panel agrees that a review team—and therefore the Detroit Financial Review Team—is not a public body under the OMA. Because the trial court erred by concluding that a

I. SEPARATION OF POWERS AND THE TRIAL COURT'S INTRUSION
INTO THE POLITICAL PROCESS

All judges, including me, are at risk of overstepping boundaries during an intense, frenetic legal battle, and, for that reason, all judges must rely on the federal and state constitutions, each other, and the appellate system to recognize and respect boundaries.[3] On issues of first impression, such as the OMA issue at the core of the present dispute, it is not unusual to be reversed by a higher court. Trial courts must make rapid-fire decisions, while the appellate courts can take weeks, even months, to research and deliberate. All judges will do well to keep in mind Thomas Jefferson's insightful observations: "One single object . . . will entitle you to the endless gratitude of society; that of restraining judges from usurping legislation." Lipscomb & Bergh, eds, Letter from Thomas Jefferson to Edward Livingston (March 25, 1825), in *The Writings of Thomas Jefferson* (Washington, D.C.: The Thomas Jefferson Memorial Association, Library ed, 1904), vol XVI, p 113. And similarly, "[judges] have at times overstepped their limit by undertaking to command executive officers in the discharge of their executive duties . . . ." Ford, ed, Letter from Jefferson to Jarvis, in *The Writings of Thomas Jefferson*, p 161.

At the heart of the cases now before the Court is the political question doctrine.[4] The doctrine requires

review team is a public body, I believe we are compelled to reverse and vacate the various rulings and orders the trial court entered in these cases.

[3] In this regard, we as judges are susceptible to what is commonly known as "judicial robe disease." We reduce our susceptibility by adhering to the constitutional separation-of-powers principles.

[4] For an extensive discussion of the concept of separation of powers and the political question doctrine, see *Bendix Safety Restraints Group, Allied Signal, Inc v City of Troy*, 215 Mich App 289, 294-300; 544 NW2d 481

judges to avoid entering into the political process and to put aside personal policy preferences when interpreting statutes. As the United States Supreme Court has stated, the Framers of the Constitution recognized the "sharp necessity to separate the legislative from the judicial power . . . ." *Plaut v Spendthrift Farm, Inc*, 514 US 211, 221; 115 S Ct 1447; 131 L Ed 2d 328 (1995). Judges cannot avoid their responsibility to decide cases merely because the cases present issues having political implications. See *Zivotofsky ex rel Zivotofsky v Clinton*, 566 US ___, ___; 132 S Ct 1421, 1427-1428; 182 L Ed 2d 423 (2012). Nevertheless, under the political question doctrine, courts do not have authority to decide matters that the constitutional text demonstrably commits to a coordinate political department, or matters that lack judicially discoverable and manageable standards for resolution. *Id.* at ___; 132 S Ct at 1427.

With these considerations in mind, the critical legal question for the trial court to consider was whether the Detroit Financial Review Team is a "public body" within the meaning of the OMA—not whether a review team *should* (in the trial court's opinion) be subject to the OMA or whether it is desirable (again, in the trial court's opinion) for some or all of the meetings of the Detroit Financial Review Team to be open to the public. Unfortunately, the trial court missed this critical question. Rather, as reflected in the trial court's emphasis at the February 15, 2012, hearing in this matter on its belief that "[t]he first caveat of this society is that we have an open government," it appears that the trial

_____

(1996) (O'CONNELL, J., concurring). Or, simply consider John Adams's pithy summary: "[T]he judicial power ought to be distinct from both the legislative and executive, and independent upon both, that so it may be a check upon both . . . ." Kurland & Lerner, eds, John Adams, Thoughts on Government (April 1776), in *The Founders' Constitution* (Chicago: The University of Chicago Press, 2000), vol I, p 109.

court's personal views clouded its resolution of the legal issues. No matter how laudable, a judge's personal views have no place in jurisprudence: "courts are not free to manipulate interpretations of statutes to accommodate their own views of the overall purpose of legislation." *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 531; 676 NW2d 616 (2004).[5] Thus, the trial court's focus in these cases should have been on the narrow legal question whether a review team is a public body under the OMA. Indeed, as the majority makes clear, it is inherent in the OMA's definition of a public body that some governmental bodies are not "public bodies" and, thus, are not subject to the open meeting requirements of the OMA. Concerns about whether the review team's meetings should be public or private are properly addressed to the Legislature, not the judiciary. See *Detroit City Council v Mayor of Detroit*, 283 Mich App 442, 461; 770 NW2d 117 (2009) ("Despite the stated policy aims of the statute, we cannot rule on policy grounds in contravention of the plain language of the statute. To the extent that the issues presented relate to public policy matters, the making of social policy generally is for the Legislature, not the courts.").

Further, a trial court's most comfortable function is to review historical facts, apply the law to those facts, and to reach a conclusion as to the lawfulness of the actions of the parties. In the present cases, the trial court preempted the parties' political actions by first assuming that the OMA applied to the Detroit Financial Review Team and then by issuing injunctions to stop the political process, particularly with regard to the Detroit Financial Review Team being able to negotiate a consent agreement with the city of Detroit. As set

---

[5] Of course, such "manipulation" could occur subconsciously rather than intentionally.

forth in the majority opinion, the trial court failed to apply the law concerning issuance of injunctions and failed to analyze the OMA in any systematic manner. It is worth repeating that courts interpret the law based on existing facts. In this matter, the trial court overstepped its bounds by asserting power over the political process before the process was complete.

Indeed, as referred to by the majority, in *Straus v Governor*, 459 Mich 526, 530; 592 NW2d 53 (1999), the Michigan Supreme Court adopted as its own this Court's opinion in that case. *Straus* includes the following discussion of the propriety of injunctive relief against the Governor or other executive branch actors:

> It is clear that separation of powers principles, Const 1963, art 3, § 2, preclude mandatory injunctive relief, mandamus, against the Governor. *People ex rel Sutherland v Governor*, 29 Mich 320; 18 Am Rep 89 (1874). Whether similar reasoning also puts prohibitory injunctive relief beyond the competence of the judiciary appears to be an open question that need not be resolved in this case. We do note that the Supreme Court has recently recognized that declaratory relief normally will suffice to induce the legislative and executive branches, the principal members of which have taken oaths of fealty to the constitution identical to that taken by the judiciary, Const 1963, art 11, § 1, to conform their actions to constitutional requirements or confine them within constitutional limits. *Durant v Michigan*, 456 Mich 175, 205; 566 NW2d 272 (1997). Only when declaratory relief has failed should the courts even begin to consider additional forms of relief in these situations. *Id.* at 206. [*Straus*, 459 Mich at 532 (quotation marks and citation omitted).]

Thus, even if the trial court had been correct in its determination that a financial review team constitutes a public body subject to the OMA, it abused its discretion by granting permanent injunctive relief against the

Detroit Financial Review Team.[6] The trial court simply granted that injunctive relief without any reasonable basis for concluding that it was necessary. Rather, in accordance with judicial restraint and deference to the coordinate executive branch of government as discussed in *Straus*, the trial court should have limited its consideration of any possible relief to declaratory relief. This is especially so, given that the applicability of the OMA to a financial review team under the very recently enacted emergency financial manager act is a matter of first impression and, as reflected in our holding, the Detroit Financial Review Team clearly had serious grounds for a good faith (and correct) belief that it was not required to comply with the OMA. The decision of the trial court to grant injunctive relief in this matter was completely unwarranted.

Accordingly, in future circumstances involving questions of the legality of conduct by state government officials or entities within the executive or legislative branches, a trial court should issue a declaratory judgment regarding those questions and presume that the other branches will follow the court's decision. This measured approach avoids a court immersing itself in the political process reserved for the political branches of government and thereby reduces the risk of stigmatizing the judiciary as being merely another political actor.

Moreover, even apart from the special consideration due to state level executive and legislative branch actors, injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent

---

[6] A trial court's grant of injunctive relief is reviewed for an abuse of discretion. *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753 NW2d 595 (2008).

danger of irreparable injury. *Pontiac Fire Fighters
Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753
NW2d 595 (2008). This Court has specifically applied
that standard in the context of the OMA and, accord-
ingly, noted that "[m]erely because a violation of the
OMA has occurred does not automatically mean that an
injunction must issue restraining the public body from
using the violative procedure in the future." *Nicholas v
Meridian Charter Twp Bd*, 239 Mich App 525, 533; 609
NW2d 574 (2000). This underscores that the grant of
injunctive relief by the trial court in this case was
inappropriate.

The trial court's interference in the activities of the
Detroit Financial Review Team, even going so far as to
enter an injunctive order to preclude that review team
from entering into a consent agreement with the city of
Detroit, markedly disrupted the political process, par-
ticularly with sensitive matters involving financial re-
forms of city government that by their very nature are
beyond judicial competence and lack judicially discov-
erable and manageable standards for resolution. See
*Zivotofsky*, 566 US at ___; 132 S Ct at 1427.[7]

---

[7] There was a more egregious lack of respect for the proper separation
of powers by the trial court that presided over *Muma v Flint Financial
Review Team*, unpublished opinion per curiam of the Court of Appeals,
issued May 21, 2012 (Docket No. 309260), with regard to which this panel
is releasing a separate opinion. In *Muma*, the plaintiff sought a declara-
tory judgment concerning the applicability of the OMA to the City of
Flint Financial Review Team and an injunction to prevent further alleged
violations of the OMA. Rather than issuing a simple declaratory judg-
ment and then allowing the state actors to take further appropriate
actions, the trial court in *Muma* used its power to intrude into spheres of
government reserved for the political branches. With a figurative swipe of
the pen, the trial court permanently enjoined the defendants in that case
(the City of Flint Emergency Financial Manager, the Governor, the State
Treasurer, and the City of Flint Financial Review Team) "from taking
any action reserved to the mayor and city council to govern and
administer Flint under its charter and ordinances." *Id.* at 3. Thus, rather

## II. CONCLUSION

Courts should not allow themselves to be used as vehicles to interfere with the political process. Except in highly unusual circumstances, it is sufficient for a trial court to issue a declaratory judgment regarding an allegedly improper action by an executive or legislative branch actor. While the trial court's actions were presumably done with no political agenda and with a view to the best interests of the parties (and the city of Detroit), the results were inappropriate injunctions issued against another branch of government, when a simple declaratory judgment would have sufficed.

I would reverse all of the trial court's rulings in their entirety.

---

than simply deciding if the City of Flint Financial Review Team had violated the OMA and providing narrow appropriate relief for any perceived violation, the trial court in *Muma* took upon itself to resolve the political future of the city of Flint, a power reserved exclusively to the other branches of government. Trial courts should rule on issues of law and not involve themselves in political questions reserved for the political branches—especially when the trial court's hearing in *Muma* took less than an hour to undo what took the other branches of government over six months to put in place. Courts are not in the business of resolving political questions. In *Muma* and the present case, a simple declaratory judgment regarding the (supposed) applicability of the OMA would have alerted the state actors to the trial court's determinations with regard to whether the OMA applied. The courts should not be administering a city government or legislating from the bench. The political question doctrine requires courts to refrain from such inappropriate engagement in the political process.